**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL LACEY; JIM LARKIN;
PHOENIX NEW TIMES, LLC,
        *Plaintiffs-Appellants,*

v.

MARICOPA COUNTY, a public entity,
JOSEPH ARPAIO, Sheriff, and AVA
ARPAIO, husband and wife; DENNIS
WILENCHIK and BECKY BARTNESS,
husband and wife; JOHN DOES I-X;
JANE DOES I-X; BLACK
CORPORATIONS, I-V; and WHITE
PARTNERSHIPS, I-V,
        *Defendants-Appellees.*

No. 09-15703

D.C. No.
2:08-cv-00997-
SRB

10007

MICHAEL LACEY; JIM LARKIN;
PHOENIX NEW TIMES, LLC,
                    *Plaintiffs-Appellees,*

                    v.

JOSEPH M. ARPAIO, Sheriff and
husband; AVA ARPAIO, wife; JOHN
DOES I-X; JANE DOES I-X; BLACK
CORPORATIONS, I-V; WHITE
PARTNERSHIPS, I-V; MARICOPA
COUNTY ATTORNEY'S OFFICE, a public
entity,
                    *Defendants,*

                    and

DENNIS WILENCHIK; BECKY BARTNESS,
wife,
                    *Defendants-Appellants.*

No. 09-15806

D.C. No.
2:08-cv-00997-
SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
December 14, 2011—San Francisco, California

Filed August 29, 2012

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Harry Pregerson, Stephen Reinhardt, William A. Fletcher,
Raymond C. Fisher, Richard C. Tallman,
Johnnie B. Rawlinson, Jay S. Bybee, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Chief Judge Kozinski;
Dissent by Judge Tallman

## COUNSEL

John T. White, Stinson Morrison Hecker LLP, Phoenix, Arizona; Michael J. Meehan (argued), Law Office of Michael Meehan, Tucson, Arizona, for the appellants.

Eileen Dennis Gilbride (argued), Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona, for appellees Joseph Arpaio and Ava Arpaio.

Timothy J. Casey (argued), Schmitt, Schneck, Smyth & Herrod, P.C., Phoenix, Arizona, for appellees Andrew Thomas, the Maricopa County Attorney's Office, and Maricopa County.

Laura A. Freeman, Zwillinger Greek Zwillinger & Knecht PC, Phoenix, Arizona; Timothy J. Casey, Schmitt, Schneck, Smyth & Herrod, P.C., Phoenix, Arizona, for appellees-cross-appellants Dennis Wilenchik and Becky Bartness.

---

## OPINION

BYBEE, Circuit Judge:

This § 1983 case concerns allegations of unlawful conduct by officials in the Maricopa County Sheriff's Office ("MCSO") and the Maricopa County Attorney's Office ("MCAO"), conduct which culminated in the late-night arrests of Michael Lacey and Jim Larkin, owners of the *Phoenix New Times*, LLC. Lacey, Larkin, and the *New Times* (collectively, "Lacey") sued Sheriff Joseph Arpaio, head of the MCSO; County Attorney Andrew Thomas, head of the MCAO; former Independent Special Deputy Maricopa County Attorney Dennis Wilenchik; and Maricopa County (collectively, "defendants") under numerous federal and state causes of action. The district court dismissed all federal claims, and remanded all state law claims back to the Arizona courts. We affirm in part and reverse in part, finding that Lacey adequately alleged several causes of action for which the defendants are not entitled to immunity. We remand for further proceedings.

## I.   THE FACTS AND PROCEEDINGS

For purposes of this appeal, we must accept the factual allegations in the Lacey complaint[1] as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Some of the parties to this litiga-

---

[1]Lacey filed a First Amended Complaint ("FAC"), and because it supersedes the original, we refer to it as the complaint unless otherwise noted. We will denote the original complaint as "First Compl."

tion are well known to the public, and the acts alleged here have been splayed across newspapers in Arizona. As we discuss the "facts" of this case, we remind the parties and other interested persons that, because we remand this case to the district court, both sides will have an opportunity to prove or contest the "facts" alleged in the complaint and set forth in this opinion.

### A.   *Background Facts*

The *Phoenix New Times* ("*New Times*") is a small, free weekly newspaper in Arizona. According to its website, the *New Times* was formed in 1970 to "ke[ep] the Valley of the Sun's feet to the fire." *About Us*, Phoenix New Times, http://www.phoenixnewtimes.com/about/ (last visited Feb. 22, 2012). It brags that its "[h]ard-hitting investigative reports on everything from the misadventures of Sheriff Joe Arpaio to the state's troubled juvenile justice system have earned the paper a well-deserved reputation for journalistic fearlessness." *Id.* The *New Times* is a part of the Village Voice Media network. FAC ¶ 24.

The *New Times* has been publishing articles critical of Sheriff Arpaio—known as "America's toughest sheriff," *see* Joe Arpaio with Len Sherman, *America's Toughest Sheriff: How We Can Win the War Against Crime* (1996)—since the 1990s. *Id.* ¶ 33. On July 1, 2004, the *New Times* published "Sheriff Joe's Real Estate Game," authored by *New Times* reporter John Dougherty, which questioned Arpaio's commercial real estate transactions, including how he could have invested more than $690,000 in cash in commercial real estate on a modest state salary and federal pension. *Id.* ¶ 34 & n.1. The *New Times* explained that Arpaio had used a little-known Arizona statute to redact much of the information about his commercial real estate holdings from the County Recorder's public records, allegedly in response to death threats. *Id.* ¶¶ 35-36. A week later, in a July 8, 2004 *New Times* article by Dougherty entitled "Stick it to 'Em," the paper again ques-

tioned Arpaio's redaction of personal information from public records, pointing out that Arpaio's home address was available from other websites; at the end of the article, the paper published Arpaio's home address. *Id.* ¶¶ 34 n.1, 37.

Arpaio contemplated prosecuting his critics at the *New Times* under an Arizona statute prohibiting the dissemination of personal information on the Internet if disseminating it "pose[s] an imminent and serious threat" to a public law enforcement official or his family and that threat is reasonably apparent to the person publishing it online.[2] *Id.* ¶ 39. Arpaio did not raise the issue with then–Maricopa County Attorney Rick Romley at the time of publication, believing that Romley would not prosecute. *Id.* ¶ 43 & n.2. Instead, Arpaio waited another seven months, until February 2005, when he met with the new County Attorney, Andrew Thomas, and discussed his desire to prosecute those at the *New Times*. *Id.* ¶¶ 43 & n.2, 51. Thomas's staff investigated the matter but had concerns and did not immediately pursue prosecution. *Id.* ¶ 51.

Finally, in April 2005, ten months after the articles first appeared, Arpaio requested an investigation. *Id.* ¶ 52. The MCAO conducted a formal evaluation in May 2005 and prepared an "Incident Review Memo"; it summarized the weaknesses of the case, including that Arpaio significantly delayed in reporting the incident, there was no solid evidence that

---

[2]Arizona Revised Statutes § 13-2401(A) provides:

> It is unlawful for a person to knowingly make available on the world wide web the personal information of a peace officer, justice, judge, commissioner, public defender or prosecutor if the dissemination of the personal information poses an imminent and serious threat to the peace officer's, justice's, judge's, commissioner's, public defender's or prosecutor's safety or the safety of that person's immediate family and the threat is reasonably apparent to the person making the information available on the world wide web to be serious and imminent.

Violation of the statute is a felony. *Id.* § 13-2401(C).

Arpaio feared for his safety, and Arpaio's personal information was already publicly available. *Id.* ¶ 53. The memorandum also noted that Arpaio was demanding that charges be filed and that if no charges were filed, there would be "problems" between the MCSO and the MCAO. *Id.* ¶ 54. On June 20, 2005, an investigator for the MCAO submitted a supplemental report, finding that numerous public documents contained Arpaio's personal information and noting that Arpaio had waited ten months to request a prosecution and chose not to report it to any prosecuting agency other than the MCAO under Thomas. *Id.* ¶ 50. In August 2005, the MCAO Incident Review Board voted not to prosecute the *New Times*. *Id.* ¶ 55.

By this time, the *New Times* was also running articles critical of Thomas, and Thomas determined that he could no longer pursue the case against the *New Times* due to a conflict of interest. *Id.* ¶¶ 56-57. He referred the case to Robert Carter Olson of the Pinal County Attorney's Office ("PCAO"). *Id.* ¶ 57; *id.* Ex. 1, at 1. Arpaio and the MCSO immediately pressured that office to prosecute, sending letters to the PCAO and requesting meetings by phone and in person. *Id.* ¶¶ 58-59. Olson, however, was unwilling to comply because he was concerned that there were First Amendment implications and insufficient evidence of an imminent threat to Arpaio. *Id.* ¶ 58.

In response to a November 15, 2005 meeting in which Olson shared these concerns, the Sheriff's Director of Legal Affairs, Ron Lebowitz, sent a strongly worded memorandum ("Lebowitz Memorandum") to the PCAO, dated November 28, to leave no issue "unresolved." *Id.* Ex. 1, at 1.[3] In it, Lebowitz explained why the *New Times* was being singled out for prosecution, even though other organizations had also published Arpaio's address through their websites:

---

[3]Lacey attached the Lebowitz Memorandum to his complaint and incorporated it by reference. *Id.* ¶ 20.

> Unlike the *New Times* web cite [sic], the three (3) other web cites raised by others as examples are neutral. In other words, none of these other web cites are or have ever been historically anti-Arpaio, especially in the consistent and invariable way that *New Times* has been since 1993. None of the other web cites have openly revealed the intent or purpose to destroy the Sheriff's career as an elected official, using all the vigor it could muster.

> [ ]None of the other web cites, historically, have resorted to writing articles against the Sheriff, using language that is inflammatory, insulting, vituperative, and the like — all of which having the effect of attracting those of the "lunatic fringe" who, for reasons of their own, view themselves as the Sheriff's sworn enemies and make it a practice to replicate *New Times* anti-Arpaio articles on web cites of their own or otherwise generally keep in touch with *New Times* as anti-Arpaio "true believers."

*Id.* Ex. 1, at 8-9.

When Olson did not respond with action, Lebowitz and Arpaio increased the pressure. Olson proposed that the newspaper simply remove Arpaio's address from the website as a compromise, but Arpaio found this proposal "intolerable." *Id.* ¶ 61. Lebowitz wrote several more memoranda to the PCAO and ultimately gave it a 10-day deadline of May 23, 2006 by which to take action on the case. *Id.* ¶ 63. When that deadline passed, he wrote to the PCAO again and stated: "The Sheriff demands action and action right now." *Id.* Despite these demands, the PCAO never initiated a prosecution. *Id.* ¶ 60. Olson left in 2007, and the new Pinal County Attorney returned the case to the MCAO. *Id.* ¶ 65.

Because Thomas had already announced his own conflict of interest in prosecuting the case, he and Arpaio decided that

Thomas should appoint Phoenix attorney Dennis Wilenchik as an Independent Special Deputy Maricopa County Attorney. *Id.* ¶ 66-67. Wilenchik was appointed in June 2007 and assumed prosecutorial responsibility for the *New Times* case. *Id.* ¶¶ 67-68. Wilenchik already had numerous connections to Arpaio and Thomas: he had hired Thomas as an associate at his law firm—even though Thomas was a candidate for County Attorney at the time and the arrangement appeared to be a disguised campaign contribution to Thomas; Thomas and Arpaio had hired Wilenchik to perform millions of dollars of legal work, representing them in both their official and personal capacities; and Wilenchik was representing Thomas and Arpaio only months before his appointment when he demanded that the *New Times* retract an unflattering piece about Thomas and threatened other newspapers with defamation suits on behalf of Arpaio. *Id.* ¶¶ 71-74. The *New Times* had previously criticized Wilenchik for his close relationship to Thomas and Arpaio before he was appointed an independent prosecutor; Wilenchik referred to the *New Times*'s criticism as "[b]irdcrap." *Id.* ¶¶ 76-77.

In August 2007, two months after his appointment, Wilenchik authored two grand jury subpoenas with numerous demands for the *New Times*. *Id.* ¶ 82. For any story critical of Arpaio, the subpoenas demanded that the paper reveal its confidential sources as well as produce reporters' and editors' notebooks, memoranda, and documents. *Id.* The subpoenas also required the *New Times* to reveal information about visitors to any story, review, listing, or advertisement on its website since 2004. *Id.* ¶ 83. Although the documents served on the *New Times* purported to be grand jury subpoenas, Wilenchik had not appeared before any grand jury or otherwise obtained approval to issue them, as required by Arizona law. *Id.* ¶¶ 81, 86.

In September 2007, Wilenchik issued another subpoena. *Id.* ¶¶ 87-88. This time the subpoena followed a *New Times* article criticizing Wilenchik for defending Arpaio against a defa-

mation suit brought by the chief of police for Buckeye, Arizona. *Id.* The subpoena demanded that the article's author produce "all documents, records, and files" related to the writing and editing of the story, and also "conversations and meetings relating to its publication." *Id.* ¶ 88.

Three weeks later, on October 10, 2007, Wilenchik decided to contact Judge Anna Baca, who was presiding over the sitting Maricopa County grand jury. *Id.* ¶ 90. At the time, Wilenchik had motions related to the *New Times* matter and a judicial disqualification matter for another judge pending before her. *Id.* ¶¶ 90-91. Wilenchik asked Carol Turoff, wife of a member of Thomas's senior management team and a former lay member of the committee charged with appointing appellate judges, to call Judge Baca at home to arrange a private meeting between Judge Baca and Wilenchik. *Id.* ¶ 90. After receiving Turoff's call on the night of October 10, Judge Baca called an emergency closed hearing the following day to review the matter; she noted the various ethical infractions that had been committed and called Wilenchik's attempt at an ex parte communication "absolutely improper." *Id.* ¶ 91.

The back-and-forth between the *New Times* and Wilenchik and Arpaio came to a head the following week. Concerned about what it believed to be a gross abuse of power by Wilenchik in issuing the subpoenas and attempting contact with Judge Baca, the *New Times* published the terms of Wilenchik's subpoenas on October 18.[4] *Id.* ¶¶ 92-93. It also questioned the motives and actions of Arpaio, Thomas, and Wilenchik in pursuing the investigation. *Id.* ¶ 98. The same day the article appeared, Wilenchik filed a motion before Judge Baca asking her to hold the *New Times* in contempt; issue arrest warrants for Michael Lacey and Jim Larkin, co-owners of the *New Times*, as well as three of their lawyers;

---

[4]Publishing the terms of a valid grand jury subpoena in Arizona is a misdemeanor, punishable by up to six months in jail. Ariz. Rev. Stat. §§ 13-707(A), -2812; FAC ¶ 97.

and fine the newspaper $90 million. *Id.* ¶¶ 99-100. That night, before the court could rule on Wilenchik's motion, Arpaio's "Selective Enforcement Unit" arrested Lacey and Larkin at their homes. *Id.* ¶¶ 24, 103.

Wilenchik's actions and the arrests were met with public and official criticism. FAC ¶ 107. Thomas promptly fired Wilenchik and, in a news conference on October 20, stated that Wilenchik's actions were "the wrong way" to bring a prosecution. *Id.* ¶ 109. A month later, on November 28, Judge Baca declared Wilenchik's grand jury subpoenas invalid. *Id.* ¶ 96. The court held that Wilenchik had acted ultra vires because prosecutors may not issue grand jury subpoenas without grand jury or court approval or notice. *Id.*

B.  *Proceedings Below*

In April 2008, Lacey, Larkin, and the *New Times* filed a complaint in the Maricopa County Superior Court, asserting various state and federal claims—including claims under 42 U.S.C. § 1983—against Thomas, Wilenchik, and Arpaio; those defendants' spouses; and the MCSO and MCAO. The case was removed to the U.S. District Court for the District of Arizona. In an October 6, 2008 order, the district court dismissed the MCSO and MCAO as nonjural entities, and dismissed Thomas from the suit after concluding that he was entitled to absolute prosecutorial immunity. The court dismissed the rest of the federal claims and some of the state claims but granted Lacey leave to amend the complaint. Lacey filed his First Amended Complaint on October 31, 2008, which added Maricopa County as a defendant but omitted Thomas, the MCSO, and the MCAO as defendants. After briefing and oral argument, the district court, in a March 13, 2009 order, dismissed all of the federal claims and remanded the remaining state law claims to the Maricopa County Superior Court. Lacey appealed.

A divided panel of this court affirmed in part, reversed in part, and remanded the case to the district court. *Lacey v.*

*Maricopa Cnty.*, 649 F.3d 1118, 1138 (9th Cir. 2011). We granted en banc review. *Lacey v. Maricopa Cnty.*, 663 F.3d 1032 (9th Cir. 2011).

## II. STANDARD OF REVIEW

We review de novo a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (en banc). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 677 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957))). A complaint states sufficient facts

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

*Id.* at 678 (citations omitted) (quoting *Twombly*, 550 U.S. at 556-57). Although the complaint in this case was drafted prior to *Iqbal*, that standard nonetheless governs this case. *See id.* at 684 ("*Twombly* expounded the pleading standard for 'all civil actions.' " (quoting Fed. R. Civ. P. 1)).

We review de novo the decision of a district court to grant absolute or qualified immunity to a public official. *Botello v. Gammick*, 413 F.3d 971, 975 (9th Cir. 2005).

## III.   SECTION 1983 CLAIMS

Section 1983 provides a tort remedy against "[e]very person who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Lacey has asserted various claims under the First and Fourth Amendments, made applicable to the states through the Fourteenth Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Wilenchik and Arpaio claimed that they were immune from suit. The district court rejected Wilenchik's claim of absolute immunity but dismissed the claims against both Wilenchik and Arpaio under its qualified immunity analysis for failure to state a constitutional violation. Lacey has appealed that determination with regard to four of his § 1983 claims. Wilenchik has cross-appealed the district court's determination that he is not entitled to absolute immunity. Lacey also challenges the 2008 dismissal of Thomas on absolute immunity grounds.

We deal with each of the defendants individually. We first address Wilenchik's claims to absolute immunity and, alternatively, qualified immunity. We then address Arpaio's claims to qualified immunity. Finally, we address Thomas's status as a defendant in this suit and whether he receives absolute immunity.

### A.   *Dennis Wilenchik*

Lacey appeals the district court's determination that he stated no constitutional violation by former special prosecutor Dennis Wilenchik. Wilenchik cross-appeals the district court's determination that he is not entitled to absolute immunity for approving subpoenas and ordering or advising Lacey's and Larkin's arrests. We agree with the district court that Wilenchik is not entitled to absolute immunity, and we disagree with the court that Wilenchik did not violate Lacey's

constitutional rights. We address each in turn and hold that Wilenchik is not entitled to qualified immunity.

1. Absolute Immunity

**[1]** Prosecutors performing their official prosecutorial functions are entitled to absolute immunity against constitutional torts. The Supreme Court has held that this rule follows for the same reason that prosecutors were given immunity at common law—without it, resentful defendants would bring retaliatory lawsuits against their prosecutors, and because a prosecutor "inevitably makes many decisions that could engender colorable claims of constitutional deprivation[, d]efending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 425-26 (1976)) (internal quotation marks omitted). Without the promise of immunity from suit, a prosecutor would be distracted from his duties and timid in pursuing prosecutions rather than exercising the independent judgment and discretion that his office requires. *See id.* Moreover, "the judicial process is available as a check on prosecutorial actions," and it reduces the need for private suits for damages to keep prosecutors in line. *Burns v. Reed*, 500 U.S. 478, 492 (1991); *see Mitchell v. Forsyth*, 472 U.S. 511, 522-23 (1985) ("[T]he judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need for damages actions to prevent unjust results.").

**[2]** At the same time, absolute immunity is an extreme remedy, and it is justified only where "any lesser degree of immunity could impair the judicial process itself." *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Malley v. Briggs*, 475 U.S. 335, 342 (1986)). Immunity attaches to "the nature of the function performed, not the identity of the actor who performed it." *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)) (internal quotation marks omitted). The prosecu-

tor thus "bears the burden of showing that . . . immunity is justified for the function in question." *Burns*, 500 U.S. at 486. If Wilenchik is entitled to absolute immunity, it is because he was acting in a prosecutorial role, not because he carried the title of Independent Special Deputy Maricopa County Attorney.

**[3]** Determining what functions are prosecutorial is an inexact science. The functions are those "intimately associated with the judicial phase of the criminal process," in which the prosecutor is acting as "an officer of the court." *Van de Kamp*, 555 U.S. at 342 (quoting *Imbler*, 424 U.S. at 430-31 & n.33). Absolute immunity also protects those functions in which the prosecutor acts as an "advocate for the State," even if they "involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Burns*, 500 U.S. at 486 (quoting *Imbler*, 424 U.S. at 431 n.33). These actions need not relate to a particular trial and may even be administrative in nature, yet are connected to the trial process and "necessarily require legal knowledge and the exercise of related discretion." *Van de Kamp*, 555 U.S. at 344 (holding that "determining what information should be included in the training or the supervision or the information-system management" regarding prosecutors' duties to defendants was an administrative function to which absolute immunity attaches). Functions for which absolute prosecutorial immunity have been granted include the lawyerly functions of organizing and analyzing evidence and law, and then presenting evidence and analysis to the courts and grand juries on behalf of the government; they also include internal decisions and processes that determine how those functions will be carried out. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Prosecutors are absolutely immune from liability for the consequences of their advocacy, however inept or malicious, because it is filtered through a neutral and detached judicial body; they are not necessarily immune for actions taken outside this process, including actions logically—though not necessarily temporally—prior to advocacy, such as those

"normally performed by a detective or police officer," like gathering evidence, *id.*, and those separate from the process, like providing legal advice to the police, *see Burns*, 500 U.S. at 495-96.

**[4]** Wilenchik argues that he is entitled to absolute immunity for claims arising out of the issuance of the purported grand jury subpoenas and those arising out of the arrests. With regard to the subpoenas, Wilenchik cannot claim absolute immunity, although we think the issue is a close one. Prosecutors generally enjoy absolute immunity for their conduct before grand juries, *see id.* at 490 n.6; *Yaselli v. Goff*, 275 U.S. 503, 503 (1927) (per curiam) (summarily affirming lower court decision, 12 F.2d 396 (2d Cir. 1926), that immunity extended to prosecutor's conduct before a grand jury); *Rehberg v. Paulk*, 611 F.3d 828, 838 (11th Cir. 2010), *aff'd on other grounds*, 132 S. Ct. 1497 (2012), because that conduct is integral to "the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430. But we can find no justification for extending absolute immunity to the acts of a prosecutor designed to *avoid* the "judicial phase." Here, Wilenchik is alleged to have acted ultra vires when he issued the subpoenas without ever obtaining grand jury or court approval. The complaint states that Judge Baca, in a November 28, 2007 order, found

> grand jury abuse at the hands of Wilenchik. No grand jury had approved the Wilenchik subpoenas—Wilenchik had acted as a one-man grand jury. County prosecutors, the Judge ruled, have no common law powers to subpoena witnesses or documents in Arizona (citing *Gershon v. Broomfield*, 131 Ariz. 507, 642 P.2d 852 (1982)). A prosecutor seeking grand jury evidence by subpoena must either secure the prior permission of the grand jury or must notify the grand jury foreperson and the presiding criminal judge within 10 days of issuing a subpoena unilaterally. Wilenchik did neither.

FAC ¶ 96. As the complaint states, under Arizona statutes, a county attorney may issue a grand jury subpoena to the target of an investigation under two circumstances. *See* Ariz. Rev. Stat. § 13-4071(B)(2). First, the prosecutor may do so with the prior consent of the grand jury. *See id.*; *Gershon*, 642 P.2d at 853-54. Second, a prosecutor may issue a subpoena during an investigation without a grand jury's prior consent, but only if the county attorney notifies both the grand jury's foreman and the presiding judge of the superior court within ten days of issuing the subpoena. Ariz. Rev. Stat. § 13-4071(C). The complaint recites that Wilenchik did neither.

[5] Had Wilenchik followed Arizona law, his drafting of the grand jury subpoenas would likely have come within the shield of absolute immunity. *See Burns*, 500 U.S. at 490 n.6. But the facts alleged in the complaint suggest that Wilenchik avoided taking the steps that would have protected him from suit, perhaps precisely to avoid the scrutiny of the grand jury or the court. *See* FAC ¶¶ 81, 86. The prosecutor's immunity is rooted in "the same considerations that underlie the common-law immunities of judges and gran[d] jurors acting within the scope of their duties," *Imbler*, 424 U.S. at 422-23, which is to "protect[ ] the judicial process," *Burns*, 500 U.S. at 492. But the judicial process also serves as "a check on prosecutorial actions." *Id.* Those checks failed here because the prosecutor acted on his own authority, rather than securing the approvals required by Arizona law. Even if Wilenchik's authoring of a grand jury subpoena might in another context be considered "a vital part of the administration of criminal justice," by avoiding judicial scrutiny, his actions were one step "further removed from the judicial phase of criminal proceedings." *Malley*, 475 U.S. at 342. Where the prosecutor has side-stepped the judicial process, he has forfeited the protections the law offers to those who work within the process.[5]

---

[5]In *Rehberg v. Paulk*, the Eleventh Circuit held that a district attorney was not entitled to absolute immunity for issuing subpoenas before a grand jury was empaneled. 611 F.3d at 835, 842. It reached this conclusion, with little analysis, on the grounds that the subpoenas were part of the investigation, and investigatory functions do not justify absolute immunity. *Id.* at 842. We reach our conclusion on narrower grounds.

**[6]** Wilenchik is also not entitled to absolute immunity in connection with ordering or advising those making the arrests. Neither are prosecutorial functions. In *Burns*, the Supreme Court held that giving legal advice to police, including advice as to whether there is probable cause to arrest a suspect, is not a function protected by absolute immunity. 500 U.S. at 493-96; *accord Ewing v. City of Stockton*, 588 F.3d 1218, 1233-34 (9th Cir. 2009). The mere rendering of legal advice is not so closely connected to the judicial process that litigation concerning that advice would interfere with it. *Burns*, 500 U.S. at 493-94. Further, "it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice." *Id.* at 495. Thus, to the extent that Wilenchik counseled police about the propriety of the arrests, he is not entitled to absolute immunity for the consequences.

**[7]** The same logic also precludes Wilenchik from claiming immunity for playing other roles in the arrests, including ordering them. Such decisions entail the same determination. When a prosecutor orders or counsels warrantless arrests, he acts directly to deprive someone of liberty; he steps outside of his role as an advocate of the state before a neutral and detached judicial body and takes upon himself the responsibility of determining whether probable cause exists, much as police routinely do. Nothing in the procuring of immediate, warrantless arrests is so essential to the judicial process that a prosecutor must be granted absolute immunity. Indeed, the aberrant nature of Wilenchik's behavior is evinced by the fact that he ordered the arrests while he had a request for arrest warrants pending before a judge. His decisions to proceed outside the judicial process cannot be the basis for affording him absolute immunity from suit.

2. Qualified Immunity

Qualified immunity "represents the norm" for government officials exercising discretionary authority, *Harlow v. Fitzger-*

*ald*, 457 U.S. 800, 807 (1982), including prosecutors who are not acting as an advocate for the state and may not be entitled to absolute immunity, *Buckley*, 509 U.S. at 273. Like absolute immunity, qualified immunity is an immunity from suit and not merely damages. *Mitchell*, 472 U.S. at 526. Under qualified immunity, an officer is protected from suit when he makes a reasonable mistake of law or fact. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Determining whether a defendant is entitled to qualified immunity involves a two-pronged analysis. First, we ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 235-236. Second, we must ask "whether the right was clearly established." *Id.* A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. We have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236; *see also Mueller v. Auker*, 576 F.3d 979, 993-94 (9th Cir. 2009). If we answer the first of the two inquiries in the negative, then the officer's conduct was constitutional, and there can be no violation of § 1983. The officer has no need for immunity; he is innocent of the alleged infractions. If the answer to the first question is "yes" and the second question "no," then the officer's conduct is protected by qualified immunity. Only when an officer's conduct violates a clearly established constitutional right—when the officer should have known he was violating the Constitution—does he forfeit qualified immunity.

Lacey asserted that the defendants are each liable under 42 U.S.C. § 1983 based on their own actions; he has also alleged that Arpaio is liable under a theory of supervisory liability, and that Arpaio, Wilenchik, and Thomas are liable under a theory of civil conspiracy. Section 1983 has a causation

requirement, with liability extending to those state officials who "subject[ ], or cause[ ] to be subjected," an individual to a deprivation of his federal rights. As we explained in *Johnson v. Duffy*:

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made. Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

588 F.2d 740, 743-44 (9th Cir. 1978) (citation omitted); *see also Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011) (holding that an official "need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury' " to be held liable as long as "culpable action . . . is directly attributed to [him]" (quoting *Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991))).

Culpability, however, is limited not only by the causal connection of the official to the complained-of violation, but also by his intent (depending on the underlying constitutional violation at issue) to deprive another of that person's rights; both limitations on the nature of culpable conduct are critical, for "each Government official . . . is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. For an official to be liable for another actor's depriving a third party of his constitu-

tional rights, that official must have at least the same level of intent as would be required if the official were directly to deprive the third party of his constitutional rights. *See id.*[6] With this proviso, a supervisor can be held liable for the constitutional torts of his subordinates if "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation" exists, *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)); *see Iqbal*, 556 U.S. at 677. But an official with no official authority over another actor can also be liable for that actor's conduct if he induces that actor to violate a third party's constitutional rights, provided that the official possesses the requisite intent, such as retaliatory animus. *See Hartman v. Moore*, 547 U.S. 250, 262 (2006); *see also Harris v. Roderick*, 126 F.3d 1189, 1196-97, 1204 (9th Cir. 1997) (finding liability for both supervisory and nonsupervisory officials).

The district court granted judgment to Wilenchik on the grounds that Lacey's complaint failed to state a claim for deprivation of a constitutional right. For the most part, we disagree with the district court that the allegations fail to state a constitutional tort, and we hold that Wilenchik is not entitled to qualified immunity for them.

### a. First Amendment Retaliation

**[8]** Lacey claims that Wilenchik violated his First Amendment rights by investigating and arresting him in retaliation for articles published in the *New Times* and with the purpose of suppressing the exercise of those rights. "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right[';] . . . the First Amendment prohibits government officials from subject-

---

[6]In claims under the Eighth Amendment, we have recognized that a supervisor also may be accountable under § 1983 if he was deliberately indifferent to unconstitutional conditions in the prison. *See Starr*, 652 F.3d at 1205.

ing an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman*, 547 U.S. at 256 (first alteration in original) (citation omitted) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). We have held that "to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.' " *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994)). Lacey need not show his "speech was actually inhibited or suppressed." *Id.* Rather, we consider "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds*, 520 U.S. 1273). Lacey must allege facts ultimately enabling him to "prove the elements of retaliatory animus as the cause of injury," with causation being "understood to be but-for causation." *Hartman*, 547 U.S. at 260; *see id.* ("It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."); *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008).

**[9]** Lacey has adequately alleged that Wilenchik's primary intent was to silence the *New Times*'s protected speech, which came in the form of newspaper articles criticizing public officials. First, Wilenchik's actions were sufficient to chill Lacey's protected speech.[7] Wilenchik issued broad, invalid subpoenas demanding that the paper reveal its sources, disclose its reporters' notes, and reveal information about anyone who visited the *New Times*'s website; Wilenchik's motions

---

[7]For purposes of this opinion, we assume that the *New Times* articles preceding the publication of Arpaio's address were protected speech.

for arrest warrants, contempt findings, and fines show that he meant the *New Times* to fear them as valid. He did not wait for the warrants or other official approval before authorizing Arpaio's "Selective Enforcement Unit" to arrest Lacey and Larkin at their homes. In the circumstances of this case, to state that "[a]rresting someone in retaliation for their exercise of free speech rights" is sufficient to chill speech is an understatement. *Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir. 2008); *see White v. Lee*, 227 F.3d 1214, 1237-38 (9th Cir. 2000) (holding that intrusive investigation that did not culminate in an arrest could chill the exercise of First Amendment rights).[8]

**[10]** Second, Wilenchik's actions against Lacey, Larkin, and the *New Times* were plainly intended to punish them for their First Amendment activities and deter them from future activities. Although Wilenchik's entire alleged course of conduct evinces this, the proof is clearly found in Wilenchik's efforts to have Lacey and Larkin arrested the same day the *New Times* published an article critical of his investigation. *See Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003) (proximity in time supports an inference that the motive was unconstitutional retaliation). This, along with Wilenchik's lacking probable cause to have Lacey and Larkin arrested, raises the strong inference that Wilenchik was motivated by retaliatory animus and that it was a but-for cause of his actions. It is hard to conceive of a more direct assault on the First Amendment than public officials ordering the immediate arrests of their critics. And, in this case, there was nothing subtle about their efforts to stifle the *New Times*.

---

[8]The Supreme Court recently addressed whether a lack of probable cause was a necessary element of a cause of action for retaliatory arrest in violation of the First Amendment in *Reichle v. Howards*, 132 S. Ct. 2088 (2012). It only held that, in light of *Hartman*, "it was not clearly established [in 2006] that an arrest supported by probable cause could violate the First Amendment." *Id.* at 2093-95. We need not consider *Reichle*'s effect on our precedent because, for reasons we will explain, Lacey sufficiently alleged lack of probable cause.

**[11]** We have no difficulty concluding that, if the allegations are proven, Wilenchik violated Lacey's clearly established First Amendment rights. Wilenchik is therefore not entitled to qualified immunity.

b.    False Arrest

**[12]** Lacey claims that Wilenchik is liable for ordering or counseling the MCSO to arrest him without probable cause.[9] "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City & Cnty. of S.F.*, 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when there is a fair probability or substantial chance of criminal activity." *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004) (quoting *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)) (internal quotation marks omitted). "It is well-settled that 'the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search.' " *Id.* (quoting *Bishop*, 264 F.3d at 924).

**[13]** To maintain an action for false arrest against Wilenchik, Lacey must plead facts that would show Wilenchik ordered or otherwise procured the arrests and the arrests were without probable cause. As to the first point, Lacey has adequately alleged that Wilenchik was personally

---

[9]Although the complaint alleges that "Plaintiffs" were subjected to false arrest, the facts only support that Plaintiffs Lacey and Larkin were ever arrested, not the *New Times* as a corporate entity. Thus, only Lacey and Larkin have a viable Fourth Amendment claim.

Because a corporation is a "person" within the meaning of the Fourteenth Amendment, *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 881 n.9 (1985), and is entitled to the protections of the First Amendment, *Citizens United v. FEC*, 130 S. Ct. 876, 899-900 (2010), the *New Times* as a corporation may continue with its First Amendment retaliation and Fourteenth Amendment selective enforcement claims to the extent those claims are not premised on arrest.

involved in the decision to arrest Lacey and Larkin even though he did not personally arrest them.[10] The complaint recites that Wilenchik's former partner, William French, and staff from Wilenchik's office claimed that "Wilenchik did indeed authorize and advise Arpaio to conduct the arrests by the 'Selective Enforcement Unit.' " FAC ¶ 111.

[14] Whether Wilenchik knew that there was no probable cause for the arrests is a closer question. In general, we must ask whether "a prudent person would believe [that Lacey] had committed a crime." *Dubner*, 266 F.3d at 966. Arizona's grand jury disclosure statute makes it a misdemeanor "if the person knowingly discloses to another the nature or substance of any grand jury testimony or any decision, result or other matter attending a grand jury proceeding." Ariz. Rev. Stat. § 13-2812(A).[11] Lacey has alleged that Wilenchik knew that

---

[10]We note that the complaint pleads alternative facts about who ordered the arrests and how they were ordered. *See, e.g.*, FAC ¶ 25 (stating that "Arpaio's top-aide, Chief Hendershott, claims to have personally ordered the arrests. Other witnesses, including lawyers from Wilenchik's office, claim that the arrests were made after consultation with Wilenchik and lawyers from his office."). This is permissible. Fed. R. Civ. P. 8(d)(2)-(3). "If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *Id.* at 8(d)(2). We therefore assume, where relevant, that both Arpaio and Wilenchik ordered or counseled the arrests, and ignore the allegations concerning other actors that would render the pleadings insufficient.

We also note that Lacey has pled conspiracy between Wilenchik and Arpaio. Although we believe the allegations are sufficient to state a cause of action against Wilenchik by themselves, pleading conspiracy may further draw Wilenchik into the claims based on his complicity in the actions of others. *See* Section IV.D, *infra*.

[11]Ariz. Rev. Stat. § 13-2812 provides in full:

A.   A person commits unlawful grand jury disclosure if the person knowingly discloses to another the nature or substance of any grand jury testimony or any decision, result or other matter attending a grand jury proceeding, except in the proper discharge of official duties, at the discretion of the prosecutor to inform a victim of the status of the case or when permitted by the court in furtherance of justice.

B.   Unlawful grand jury disclosure is a class 1 misdemeanor.

he had issued the subpoenas on his own authority and that they were not, in fact, part of any grand jury proceeding. *See* FAC ¶ 86 ("The [August 24, 2007] subpoenas were issued . . . without any formal charges or indictments pending, and without notice to or the approval of a Court or grand jury."). If so, then Wilenchik knew that, by publishing the content of invalid subpoenas, Lacey and Larkin had not committed the crime of disclosing any "matter attending a grand jury proceeding," Ariz. Rev. Stat. § 13-2812(A). There was no relevant grand jury proceeding, and Wilenchik's failure to receive authorization or notify the court and grand jury foreman cannot be attributed to mistake or some other reasonable error in judgment. Lacey and Larkin have thus alleged that Wilenchik violated their Fourth Amendment right to be free from false arrest by ordering their arrests without probable cause to do so.

[15] As alleged, the Fourth Amendment violation is obvious. Wilenchik is not entitled to qualified immunity with regard to Lacey's and Larkin's false arrest claims, and those claims may proceed.

c.  Malicious Prosecution

[16] Lacey also brings a § 1983 claim for malicious prosecution. The district court dismissed this claim because it found that Lacey failed to show that there was no probable cause for the arrests. To claim malicious prosecution, a petitioner must allege "that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995); *see also Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1204 (9th Cir. 2003) (stating that malicious prosecution "concern[s] the wrongful use of legal process"). It requires "the institution of criminal proceedings against another who is not guilty of the offense charged" and that "the proceedings have termi-

nated in favor of the accused." Restatement (Second) of Torts § 653 (1977).[12] In general, a claim of malicious prosecution is not cognizable under § 1983 "if process is available within the state judicial systems" to provide a remedy, although "we have also held that an exception exists . . . when a malicious prosecution is conducted with the intent to . . . subject a person to a denial of constitutional rights." *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (en banc).

Lacey has not alleged that there was any "prosecution," nor has he alleged that any criminal proceeding was terminated in his favor. Although being "lawfully arrested on a criminal charge" may be considered the institution of a criminal proceeding, Restatement (Second) of Torts § 654(2)(c), where "the arrest is not a valid one, an action for malicious prosecution will not lie unless some further step is taken, such as bringing the accused before a magistrate for determination whether he is to be held," *id.* § 654 cmt. e. "If there is nothing more than the false arrest and the accused is released without any further proceeding," the remedy is limited to damages for the false arrest. *Id.*; *see also Blaxland*, 323 F.3d at 1204-05.

**[17]** Although Lacey and Larkin were arrested, they have not alleged that any process resulting in the initiation of criminal proceedings followed this arrest. Accordingly, Lacey has not identified any action taken by Wilenchik that can properly be characterized as a prosecution. He has simply recast the false arrest claim as a claim for malicious prosecution, which

---

[12]The Supreme Court has noted two significant differences between malicious prosecution and false arrest: (1) the former "permits damages for confinement imposed pursuant to legal process," whereas the latter only allows damages for the time one is detained until arraignment; and (2) an additional "element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused." *Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* 874, 888 (5th ed. 1984)).

he may not do. The district court properly dismissed the malicious prosecution claims.

### d. Selective Enforcement

[18] Lacey argues that Wilenchik violated the Equal Protection Clause by singling out Lacey and Larkin for investigation and arrest. Although the district court primarily characterized their claim as one for "selective prosecution," on appeal Lacey calls it a claim for "selective enforcement." Lacey's complaint adequately supports this characterization, although the label is probably not relevant. To prevail on an equal protection claim under the "Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose." *Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1152 (9th Cir. 2007) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Enforcement may be shown through a variety of actual or threatened arrests, searches and temporary seizures, citations, and other coercive conduct by the police. *See id.* at 1152-54; *see also United States v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005); *Flowers v. Fiore*, 359 F.3d 24, 34 (1st Cir. 2004); *Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001); *United States v. Avery*, 137 F.3d 343, 358 (6th Cir. 1997). In order to prove a discriminatory effect, "the claimant must show that similarly situated individuals . . . were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

[19-20] The standard for proving discriminatory effect "is a demanding one." *Id.* at 463. Yet, to state a claim, Lacey need only allege some facts, either anecdotal or statistical, demonstrating "that similarly situated defendants . . . could have been prosecuted, but were not." *Id.* at 469; *see also Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) ("[I]t is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared.") Lacey has met this burden with regard to the investigatory activities

related to the publication of Arpaio's home address, but not with respect to the publication of the grand jury subpoenas.[13] Lacey alleged that, at the time of the *New Times*'s publication of Arpaio's address, Arpaio's address was also publicly available on at least three other websites—the websites of the Maricopa County Recorder, the Maricopa County Election Commission, and the Republican Party.[14] Although the Arizona privacy statute shields an "employee of a county recorder . . . [who] publishes personal information, in good faith, on the web site of the county recorder," Ariz. Rev. Stat. § 13-2401(B), it provides no such protection for an employee of the Election Commission, and it says nothing about employees of political parties. Further, the complaint alleges that the MCAO's own investigators also reached the conclusion that Arpaio's address was widely available on the Internet, suggesting it may have been available on other websites as well. In any case, the allegations and Lebowitz Memorandum are sufficient to show that there were other websites publishing the same information as Lacey that were not investigated. Those responsible for the other websites were similarly situated if we accept the facts in the complaint as true. They and those responsible for the *New Times* website all satisfied the first element of the Arizona privacy statute in that they "knowingly ma[d]e [Arpaio's address] available" on the Internet. *Id.* § 13-2401(A). But Lacey emphasizes that the other two elements—"the dissemination of the personal information poses an imminent and serious threat" and the "threat is reasonably apparent to the person making the information

---

[13]With respect to the arrests for violating the grand jury secrecy statute, the complaint provided only a vague assertion that those who commit non-violent misdemeanors are usually not arrested. These allegations are insufficient because they fail to specify a similar class, such as those alleged to have violated the grand jury secrecy statute, with which comparisons can be made to Lacey's case, so Lacey has failed to state a claim for selective enforcement with regard to the arrests. *See Armstrong*, 517 U.S. at 465; *Rosembaum*, 484 F.3d at 1153-54.

[14]This information is contained in the attached Lebowitz Memorandum. FAC Ex. 1, at 7.

available on the world wide web," *id.*—were not satisfied by any of the website operators' actions because there was never any evidence suggesting that the publication of Arpaio's address by any website ever posed an imminent and serious threat to Arpaio. *See* FAC ¶ 41 ("There was no evidence that Arpaio was then, or ever, under any credible threat of 'imminent harm' as a result of the publication of his home address on *The New Times* web site."); *id.* ¶ 46 ("[E]ven a cursory investigation would have revealed that the only 'death threats' to Arpaio were 'made-for-TV' contrivances by the Sheriff's public relations officers."); *id.* at ¶¶ 47-48 ("Arpaio, himself, obviously did not feel any 'imminent' threat from the . . . article, because he was content to wait for many months before requesting any investigation. . . . In fact, Arpaio has continued, to this day, to publicize and publish his home address to citizens and the public at large."). Accordingly, Lacey need not allege that publication by the other websites posed an "imminent and serious threat" in order to show that the other websites were similarly situated. They were similarly situated by virtue of the fact that they too had published Arpaio's address but were never investigated or prosecuted. Admittedly, this case is a bit unusual in that we are assuming there was no violation of the law for Wilenchik to investigate, whereas selective prosecution has developed mostly in the context of otherwise legitimate prosecutions where it is clear that the law was violated. But we find no requirement that, to state a § 1983 claim for selective prosecution, one must essentially concede liability.[15]

---

[15]It also will not do for Wilenchik to claim that he made a reasonable mistake of law or fact in applying the little-used Arizona privacy statute to the actions of the *New Times*. *See* Tallman Dissent, 10081-82. Although we use a reasonable official standard in determining whether reasonable mistakes were made, we also look to the knowledge possessed by the defendant. *See Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011). Based on the allegations in the complaint, it is reasonable to assume that Wilenchik had access to both the MCAO's extensive investigation into the *New Times*'s publications and Arpaio's personal knowledge of the threats against him. We cannot find at this stage that Wilenchik reasonably thought that the *New Times*, and the *New Times*

To establish that Wilenchik was motivated by an improper purpose, Lacey must show that Wilenchik decided to enforce the law against him "on the basis of an impermissible ground such as race, religion or exercise of . . . constitutional rights." *United States v. Kidder*, 869 F.2d 1328, 1336 (9th Cir. 1989) (quoting *United States v. Moody*, 778 F.2d 1380, 1386 (9th Cir.1985), *amended on other grounds*, 791 F.2d 707 (9th Cir. 1986)). The discussion above makes clear that Lacey has properly pled this element. The complaint plainly alleges that the *New Times* was singled out for enforcement. Lebowitz, in his Memorandum, argued against the PCAO's assertion that the *New Times* "should not be singled out for prosecution." FAC Ex. 1, at 7. He justified targeting the *New Times* by explaining at length how "[n]one of the other web cites[sic], historically, have resorted to writing articles against the Sheriff." *Id.* at 7-8. The complaint alleges that Wilenchik shared this vision and

> did the bidding of . . . the Sheriff in their attempt to punish and financially ruin a newspaper that was too often critical of him too. . . . [Wilenchik] attempted to put the newspaper out of business through selective, malicious, and improper means and methods of investigation and prosecution.

FAC ¶ 115.

Wilenchik argues that he cannot be liable for selective enforcement because, as a special prosecutor, he was charged with investigating only one potential violation of the law. It is a curious argument, and we discuss the special consider-

---

alone, posed a serious and imminent threat to Arpaio's safety by publishing Arpaio's address. Any finding of reasonableness on Wilenchik's part would rely on facts to be determined by a jury. *See Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (denying qualified immunity because any reasonable mistake might "depend on the jury's resolution of disputed facts and the inferences it draws therefrom").

ations attendant to special prosecutors in Section III.C.2, *infra*, but we are not persuaded that it is a meritorious argument. Even as a "special prosecutor," Wilenchik bears some responsibility for knowing what can reasonably be charged under Arizona law. It is no defense to the claim that he decided to prosecute the *New Times* in retaliation for its First Amendment-protected activities to say that Wilenchik did not have the authority to prosecute anyone else if he shared Arpaio's purpose in singling out the *New Times*; the limitation on his power does not relieve Wilenchik of the duty to exercise judgment consistent with the Constitution.

**[21]** Wilenchik is thus not entitled to qualified immunity, and Lacey may proceed with his selective enforcement claim.

## B. *Joseph Arpaio*

The district court held that Lacey failed to state a claim against Arpaio under each § 1983 cause of action pled, which are the same as those against Wilenchik. Lacey appeals this determination.

### 1. First Amendment Retaliation

**[22]** Many of the same facts that support Lacey's claims against Wilenchik for First Amendment retaliation—an intrusive investigation and arrests designed to chill his speech and press rights—also sustain the claim against Arpaio. But Arpaio is alleged to have been at it for much longer: his efforts to muffle the *New Times* preceded Wilenchik's appointment by more than two years. He pressured county attorneys in Maricopa and Pinal counties to prosecute, even after attorneys in both counties concluded there was no case. FAC ¶¶ 53-55 (Maricopa County declined to prosecute); *id.* at ¶¶ 58-65 (Pinal County declined to prosecute). Allegedly, Arpaio was involved in the decision to appoint Wilenchik; was complicit in Wilenchik's efforts to investigate and prosecute the *New Times*, Lacey, and Larkin; and ordered the

arrests. *See id.* at ¶ 67 ("Wilenchik was hired by Thomas and Arpaio."); *id.* at ¶ 80 (Wilenchik acted with "the approval and support of Arpaio."); *id.* at ¶ 25 (Arpaio's top aide claims to have "personally ordered the arrests."); *id.* at ¶ 103 ("Defendants dispatched Arpaio's aptly named 'Selective Enforcement Unit' . . to arrest Plaintiffs."); *id.* at ¶ 110 ("Wilenchik has publicly claimed the arrests were conducted, authorized, approved, and/or directed by Arpaio and/or his aides."); *id.* at ¶ 114 (Arpaio "applied unfair pressure and demands upon prosecutorial bodies, abusing the power of his office and influence, to investigate, prosecute, arrest, and jail Plaintiffs for improper and unconstitutional motives . . . based on the content of their speech.").

**[23]** We have little difficulty concluding that Arpaio is not entitled to qualified immunity on Lacey's First Amendment retaliation claims. Lacey may proceed on those claims.

    2.   False Arrest

**[24]** Lacey has pled sufficient facts to permit a trier of fact to find that Arpaio was personally involved in the arrests. Although Arpaio has denied ordering the arrests, Wilenchik "has publicly claimed the arrests were conducted, authorized, approved, and/or directed by Arpaio and/or his aides." FAC ¶ 110; *see also* FAC ¶ 114 ("[Arpaio] and/or his Office and top officials and 'Selective Enforcement Unit' ordered and/or made the late-night arrests and jailings."). As we have previously mentioned, both Wilenchik's former partner, William French, and Wilenchik's staff stated that Wilenchik and his lawyers "authorize[d] and advise[d] Arpaio to conduct the arrests." FAC ¶ 111.

Lacey's claim against Arpaio for false arrest for violating the grand jury secrecy statute is more difficult for him to establish because it requires proof that Arpaio knew there was no probable cause, which in turn requires that Lacey show that Arpaio knew the subpoenas were invalid. The time frame

for Arpaio to learn this is narrow, because the arrests were effected the same evening as the publication of the subpoenas' contents. Given the close relationship between Wilenchik and Arpaio, Wilenchik may well have communicated something about the subpoenas to Arpaio, and Arpaio may have known, as Wilenchik knew, that the subpoenas were invalid and there was no violation of the grand jury secrecy statute. On the other hand, if Wilenchik merely communicated that the statute had been violated, or represented that the subpoenas were valid, Arpaio's reliance on this assertion could be reasonable. *See Torres v. City of L.A.*, 548 F.3d 1197, 1212 (9th Cir. 2008) ("[W]here an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous. The lynchpin is whether the officer's reliance on the information was objectively reasonable." (citation omitted) (quoting *Motley v. Parks*, 432 F.3d 1072, 1082 (9th Cir. 2005) (en banc)) (internal quotation marks omitted)). Similarly, if Arpaio were disengaged from Wilenchik's investigation and heard only about the publication of grand jury material, it might be a reasonable mistake to believe that a crime had been committed.

There are other circumstances surrounding the arrests that may suggest that Arpaio either knew or should have known that something was amiss. Although the grand jury disclosure violation was just a misdemeanor, he dispatched his special unit to arrest Lacey and Larkin at their homes in the middle of the night. Sheriff Arpaio should have known that arresting someone at his home requires a warrant, unless there are exigent circumstances. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1074-75 (9th Cir. 2009) (en banc). No warrant for Lacey's or Larkin's arrest had been issued, and we cannot fathom what exigent circumstances compelled either arrest. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Officers "have an ongoing duty to make appropriate inquiries regarding the facts received or to further investigate if insufficient details are relayed." *Motley*, 432 F.3d at 1081 (9th Cir.

2005). The strange circumstances made it objectively unreasonable for Arpaio to rely on the bare claim that a misdemeanor had been committed earlier in the day, without any information about exigent circumstances, to justify the arrests of Lacey and Larkin at their homes.

**[25]** Given the detail in the complaint and the seriousness of the allegations, we are reluctant to dismiss the false arrest claim against Arpaio on the basis of the pleadings. *Iqbal* demands more of plaintiffs than bare notice pleading, *see Iqbal*, 556 U.S. at 677-78; *Twombly*, 550 U.S. at 562-63, but it does not require us to flyspeck complaints looking for any gap in the facts. Lacey has spun a long and sometimes repetitive narration of Arpaio's determination to silence the *New Times* by any means necessary. It is a short step to infer that Arpaio was well aware of the flaws in Wilenchik's prosecution, but welcomed the excuse to have Lacey and Larkin arrested immediately, even if he lacked probable cause. We think this is all *Iqbal* requires at this stage.[16]

**[26]** Arpaio is therefore not entitled to qualified immunity on the false arrest claim, and Lacey may proceed with it.

### 3. Malicious Prosecution

**[27]** For the same reasons discussed above, the district court properly dismissed Lacey's malicious prosecution cause of action against Arpaio.

### 4. Selective Enforcement

**[28]** As with the First Amendment claim, and for largely the same reasons we allowed this claim to go forward against Wilenchik, the complaint adequately alleges that Arpaio acted

---

[16]Additionally, as we discuss in Section IV.D, Lacey has pled conspiracy between Wilenchik and Arpaio. From the conspiratorial acts, a trier of fact may also infer false arrest.

with the requisite intent and had a sufficient causal connection to the selective enforcement against the *New Times*. Arpaio was part and parcel of the effort to prosecute the *New Times*, even if he was not the prosecutor. *See Hartman*, 547 U.S. at 262 ("[A] plaintiff . . . must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging."). The Lebowitz Memorandum admits that Arpaio wanted the *New Times* prosecuted because it was "historically anti-Arpaio" and had written articles critical of Arpaio using "inflammatory, insulting, [and] vituperative" language. FAC, Ex. 1, at 8. This, along with the other evidence discussed above, is sufficient to show Arpaio's discriminatory intent and the discriminatory effect of singling out the *New Times*. Further, as with the First Amendment claim, Arpaio's insistence on prosecution, his role in the selection of Wilenchik, and his relationship with Wilenchik during the investigation provide a sufficient causal connection to the foreseeable result that Wilenchik would indeed investigate the *New Times*, resulting in its being singled out for enforcement. *See Hartman*, 547 U.S. at 264 ("[E]vidence that a prosecutor was nothing but a rubber stamp for his investigative staff or the police" would be "of great significance.").

**[29]** Arpaio is not entitled to qualified immunity on Lacey's selective enforcement claim and he may proceed on that cause of action.

C.   *Andrew Thomas*

1.   Status as a Defendant

Before we consider his claim to immunity, we must address whether the claims against Maricopa County Attorney Andrew Thomas are properly before us, as our circuit law appears to require that we consider the claims against Thomas to be waived.[17] Thomas was named as a defendant in the orig-

_____

[17]Although neither party briefed the issue and instead argued the merits of whether Thomas should receive absolute immunity, we address the

inal complaint, but the district court dismissed him from the case in its October 2008 order after finding that he was entitled to absolute prosecutorial immunity. Although the court granted leave to amend claims against other parties, it did not grant Lacey leave to amend the claims against Thomas. When Lacey filed his First Amended Complaint, he mentioned Thomas throughout the facts, but he removed all reference to Thomas as a defendant.

We have long proclaimed that "[i]t is the law of this circuit that a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997); *see N.Y. City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1025 (9th Cir. 2010); *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987); *London*, 644 F.2d at 814; *Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Etc., Local 150*, 440 F.2d 1096 (9th Cir. 1971); *Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967); *Bullen v. De Bretteville*, 239 F.2d 824, 833 (9th Cir. 1956). (For convenience, we will refer to the rule as the "*Forsyth* rule.") The *Forsyth* rule is "premised on the notion that the 'amended complaint supersedes the original, the latter being treated thereafter as non-existent.' If a plaintiff fails to include dismissed claims in an amended complaint, the plaintiff is deemed to have waived any error in the ruling dismissing the prior complaint." *Forsyth*, 114 F.3d at 1474 (citation omitted) (quoting *Loux*, 375 F.2d at 57). We have indeed considered this rule to be "hornbook law," *Bullen*, 239 F.2d at 833, even as we have recognized that it is "somewhat harsh," *Marx v. Loral Corp.*, 87 F.3d 1049, 1056 (9th Cir. 1996). This rule would appear to preclude Lacey from asserting claims against Thomas in this appeal.

issue of waiver sua sponte because of the confusion this issue appears to be working in this circuit. We have not hesitated to raise the issue when necessary in the past. *See London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir. 1981).

Several of our recent decisions, however, have struggled to dampen the harshness of the *Forsyth* rule and have left our law somewhat unsettled. In *USS-POSCO Industries v. Contra Costa County Building & Construction Trades Council*, we held that the rule "only applies to amended complaints that follow upon dismissal with leave to amend, and not to those that follow summary judgment." 31 F.3d 800, 812 (9th Cir. 1994). As we explained, "[c]ounsel were not required to risk forfeiting their client's right to appeal in order to avoid sanctions." *Id.*

In *Parrino v. FHP, Inc.*, we further narrowed the rule when we declined to apply it "to claims dismissed without leave to amend." 146 F.3d 699, 704 (9th Cir. 1998), *superseded by statute on other grounds as stated in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681-82 (9th Cir. 2006). Recently, in *Sechrest v. Ignacio*, we held that the cases establishing the *Forsyth* rule, including *London* and *Loux*, dealt only with "*voluntary* waiver"; because the petitioner was barred from reasserting certain claims in his habeas petition on pain of its dismissal if he included them, the panel concluded that his challenge to those claims he was unable to reassert was not waived. 549 F.3d 789, 804 (9th Cir. 2008).

We are unconvinced that the distinctions we noted in *Parrino* and *Sechrest* are consistent with our prior cases. In *Marx*, for example, we applied the rule where the district court dismissed a claim because it was preempted by ERISA. Following dismissal,

> [t]he court allowed the plaintiffs to file an amended complaint only on the narrow ground of equitable estoppel sounding in fraud. Thus, the plaintiffs did not include their independent contract theory in the amended complaint. Although it seems somewhat harsh to preclude them from raising the argument now, Ninth Circuit caselaw requires just such a result.

87 F.3d at 1056. We did not recognize any exception because the claims were dismissed involuntarily, *but see Sechrest*, 549 F.3d at 804, or because the district court refused to grant leave to amend the dismissed claim, *but see Parrino*, 146 F.3d at 704. Rather, we laid out a stark choice for the plaintiff: " 'If appellant desired to rely upon the original complaint, it should have refused to plead further.' " *Marx*, 87 F.3d at 1055 (quoting *Studio Carpenters Local Union No. 946 v. Loew's, Inc.*, 182 F.2d 168, 170 (9th Cir. 1950)). While harsh, the rule has some logic behind it.

Furthermore, we acknowledged in *Marx* that other courts and legal scholars have criticized the *Forsyth* rule precisely because it is *without exception*. For instance, we noted that the Tenth Circuit criticized our rule and characterized it as "formalistic." *Id.* at 1056 (quoting *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517-18 & n.1 (10th Cir. 1991)). We also cited a well-known practice guide that stated:

> The notion that an amended pleading supersedes its predecessor poses a special problem for a party whose initial pleading has been dismissed with leave to amend. By amending, does the party waive the right to object to the court's dismissal of the original statement at some later point? Some courts have held that the amended pleading supersedes the original pleading in all respects so that an appeal from a subsequent judgment on the merits cannot involve an attack on the dismissal of the original pleading.[12]
>
> [12] [citing Ninth Circuit case law including *Loux* and *Studio Carpenters*]
>
> A rule that a party waives all objections to the court's dismissal if the party elects to amend is too mechanical and seems to be a rigid application of the concept that a Rule 15(a) amendment completely replaces the pleading it amends.

6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1476, at 560-61 (2d ed. 1990). It is difficult to escape the conclusion that we have always meant what we had said.

Although criticized, our current rule makes some sense in context. We have adopted a generous standard for granting leave to amend from a dismissal for failure to state a claim, such that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (quoting *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990)). Furthermore, because we had held that under the old version of Federal Rule of Civil Procedure 15 "a motion to dismiss is not a 'responsive pleading,' " and thus a party had leave to amend as of right upon dismissal absent the filing of an responsive pleading, *id.* at 497 (quoting *Schreiber Distrib. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)) (internal quotation mark omitted), in many cases any failure to replead a claim in an amended complaint would have been voluntary. (Under the current version of Rule 15 adopted in 2009, parties have 21 days from both responsive pleadings and motions to dismiss to amend as of right, *see* Fed. R. Civ. P. 15(a)(1) (2009), so the situation has changed.) The *Forsyth* rule is also consonant with our general practice of considering a dismissal to be of the claims and not a final judgment on the complaint, *see WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1135 (9th Cir. 1997) (en banc), with the purpose of reducing the number of appeals to this court.

Despite its provenance, on reflection, we do not believe that the *Forsyth* rule is prudent or sufficiently justified, and we agree that it is formalistic and harsh. We also recognize that we are an outlier among the circuits. Although the general rule is that an amended complaint supercedes the original complaint and renders it without legal effect, most courts have

concluded that "the plaintiff does not forfeit the right to challenge the dismissal on appeal simply by filing an amended complaint that does not re-allege the dismissed claim." *Young v. City of Mount Ranier*, 238 F.3d 567, 572-73 (4th Cir. 2001) (footnote omitted); *see In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000); *Badger Pharm., Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621, 625 (7th Cir. 1993); *Davis*, 929 F.2d at 1517 (10th Cir.); *Varnes v. Local 91, Glass Bottle Blowers Ass'n of U.S. & Canada*, 674 F.2d 1365, 1370 (11th Cir. 1982); *Wilson v. First Houston Inv. Corp.*, 566 F.2d 1235, 1238 (5th Cir. 1978), *vacated on other grounds*, 444 U.S. 959 (1979); 3 *Moore's Federal Practice* ¶ 15.08(7) (1974). The Fourth Circuit has described this rule as "an exception to the general rule of waiver." *Young*, 238 F.3d at 573. We find the reasoning in some of those cases and in some of our own criticizing our rule to be persuasive.

First, our current rule is unfair to litigants. For the plaintiff whose complaint has been dismissed, the rule is not merely overly "mechanical," *see* 6 Wright & Miller, *supra*, § 1476; it creates a "Hobson's choice[,] . . . a patently coercive predicament" between amending the complaint—thereby forgoing the chance to appeal the dismissal of some claims—and appealing the dismissal of the claims in the original complaint—thereby forgoing the chance to add or replead claims that the plaintiff would otherwise be allowed to add. *In re Van Atlas Lines*, 209 F.3d at 1067; *see Davis*, 929 F.2d at 1518 ("[A] rule requiring plaintiffs who file amended complaints to replead claims previously dismissed on their merits in order to preserve those claims merely sets a trap for unsuspecting plaintiffs with no concomitant benefit to the opposing party.") (footnote omitted). In practice, however, the choice for counsel is between failing to preserve issues for appeal and risking sanctions by realleging dismissed claims. *See Parrino*, 146 F.3d at 704. The risk of sanctions is not merely hypothetical. *See, e.g.*, *Destfino v. Reiswig*, 630 F.3d 952, 959 (9th Cir. 2011) (affirming district court's inherent power to control its docket by dismissing entire complaint for failure to follow

instructions given with leave to amend); *Johnson ex rel. Wilson v. Dowd*, 345 F. App'x 26, 30 (5th Cir. 2009) (approving Rule 11 sanctions for counsel who realleged claims against judicial defendants who had already been dismissed on the grounds of absolute immunity). The rule is also unfair to the defendants to whom dismissal was granted insofar as it encourages the plaintiff to reallege claims against defendants who have already been dismissed and may feel they must return to court to answer the same claims again.

Second, the rule is unfair to district courts. We see no benefit in requiring plaintiffs to reallege claims that the district courts have already dealt with on the merits and dismissed with prejudice. Even where the district court recognizes that plaintiffs are just following the *Forsyth* rule and preserving their options on appeal, the court will still be wasting resources in parsing old claims and reiterating its prior rulings, and "there is no reason to make the court dismiss them a second time." *Young*, 238 F.3d at 573. Our stewardship requires better use of our limited judicial resources.

Third, we do not believe there is any countervailing reason for keeping the current rule. While in theory it may limit the number of complaints, and perhaps the number of orders, that we must consider on appeal, in practical terms we think there is little benefit to the orderly administration of justice. It should make little difference whether the claims on appeal are presented in one document or are sections in several complaints; we already consider in a single appeal all interlocutory rulings. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) ("The purpose [of the final judgment rule] is to combine in one review all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results."). Conversely, the current rule may actually multiply litigation. The *Forsyth* rule may well encourage parties to challenge the district court's discretion with respect to granting leave to amend the complaint and imposing sanctions for the plaintiff's attempt to reallege his

claims in order to preserve them for appeal. We think our time, and the resources of the district courts, are better spent addressing the merits of the claims than sidebar arguments over whether a particular claim can or cannot be amended.

**[30]** We therefore join our sister circuits and overrule in part the rule found in *Forsyth* and other cases "that a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint." *Forsyth*, 114 F.3d at 1474. For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.

**[31]** Applying our new rule will not prejudice any party in this case. Lacey's Notice of Appeal informed the parties that he was appealing the district court's March 2009 order and the court's prior October 2008 order. *See* Fed. R. App. P. 3(c)(1)(B). Thomas has been well represented over the course of this appeal and has fully briefed and argued the questions presented. We thus conclude that the appeal of Thomas's dismissal in the district court's October 2008 order is properly before us.

2. Absolute Immunity

Lacey appeals from the district court's October 2008 order on the issue of "whether Thomas is entitled to absolute prosecutorial immunity i[n his] hiring of Dennis Wilenchik to serve as a Special Prosecutor against the New Times." Pls.' Opening Br. at 46. Lacey's challenge to Thomas's decision to appoint a special prosecutor presents a question that we have never addressed, a question that rests at the confluence of a district attorney's employment-related decisions, such as the hiring and promoting of deputy prosecutors, and his litigation-related decisions to designate deputy prosecutors to act as the advocates of the state in particular matters.

**[32]** In *Imbler v. Pachtman*, the Court addressed, for the first time, the question of a state prosecuting officer's immunity for § 1983 liability. Holding that "in initiating a prosecution and in presenting the State's case, the prosecution is immune from a civil suit damages under § 1983," the Court noted that its decision left open whether "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." 424 U.S. at 431 & n.33. The Court pointed out that

> [a] prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to the grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

*Id.* at 431 n.33.

Since *Imbler*, the courts have had to "[d]raw[ ] a proper line between these functions," a task that indeed raises "difficult questions." *Id.* Several cases have held that the hiring decisions of a prosecutor's office are administrative in nature and are not shielded by absolute immunity, and Lacey argues that the decision to appoint Wilenchik should be understood in that context. Thomas answers that his staffing decisions are " 'closely' associated with the judicial phase of the criminal

process because [they] only can 'occur in the course of [Mr. Thomas'] role as an advocate for the State.' "

In *Van de Kamp*, the Supreme Court drew a line between a district attorney's hiring practices and the training and supervising of his prosecutors. The former, the Court said, are administrative responsibilities, while the latter are protected by absolute immunity because they are

> directly connected with the conduct of a trial. . . .
> [A]n individual prosecutor's error in the plaintiff's
> specific criminal trial constitutes an essential ele-
> ment of the plaintiff's claim. The administrative
> obligations at issue here are thus unlike administra-
> tive duties concerning, for example, *workplace hir-
> ing*, payroll administration, the maintenance of
> physical facilities, and the like. Moreover, the [tasks
> at issue] necessarily require legal knowledge and the
> exercise of related discretion . . . . And in that sense
> also Goldstein's claims are unlike claims of, say,
> *unlawful discrimination in hiring employees*.

555 U.S. at 344 (emphases added); *see also Genzler v. Lon-ganbach*, 410 F.3d 630, 644 (9th Cir. 2005); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1267 (8th Cir. 1996) (upholding absolute immunity for county attorney from whom the prose-cutor would have to receive permission to dismiss a case). In *Botello v. Gammick*, we concluded that when prosecutors involved themselves in the "personnel decision" of another office regarding whether to hire an investigator, "they were at best performing an administrative function and, as such, could only be entitled to qualified immunity." 413 F.3d 971, 977 (9th Cir. 2005). We reached the general conclusion that "an official is not entitled to absolute immunity for conduct involving termination, demotion and treatment of employees." *Id.* at 976.

We drew the line more clearly in *Ceballos v. Garcetti*, 361 F.3d 1168 (9th Cir. 2004), *rev'd on other grounds*, 547 U.S.

410 (2006). In that case, we determined that retaliatory employment actions taken by the district attorney's office against a prosecutor—demotion from his position, denial of promotion, preclusion from handling further murder cases, and a forced choice between transferring to another office and staying in his current location and handling only minor cases —were administrative actions and not part of any prosecution, so the defendants were not entitled to absolute immunity for them. *Id*. at 1184. But, at the same time, we stated that "the removal of [the prosecutor] from a particular murder case he was handling fell within the District Attorney's prosecutorial function, because it . . . is 'intimately associated with the judicial phase of the criminal process.' " *Id.* (quoting *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003)). If *removing* a prosecutor from a particular case is within the district attorney's duties, it stands to reason that *appointing* a prosecutor to a particular case would also fall within the prosecutorial function.

The line between appointments in particular cases and employment decisions follows naturally from similar decisions concerning judicial immunity. In *Forrester v. White*, for example, the Supreme Court held that a state judge "was acting in an administrative capacity when he demoted and discharged" a probation officer and therefore was not entitled to absolute immunity. 484 U.S. 219, 229 (1988). The Court reinforced its holding by comparing the judge to a district attorney: "a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys." *Id.* Similarly, in *Meek v. County of Riverside*, 183 F.3d 962, 966 (9th Cir. 1999), we held that a judge's decision to fire a court commissioner was not "inherently judicial" because the general nature of an official's duties does not render the decision judicial rather than administrative. We again distinguished between "administrative personnel decisions" that affect the court generally and decisions that involve "the disposition of particular cases." *Id*. By contrast, we explained in *New Alaska*

*Development Corp. v. Guetschow*, 869 F.2d 1298, 1302 (9th Cir. 1989), that the act of appointing a receiver was covered by absolute immunity because "the appointment at issue was made in the context of a pending case," *Meek*, 183 F.3d at 967. *See Davis v. Bayless*, 70 F.3d 367, 373 (5th Cir. 1995) ("Court appointed receivers act as arms of the court and are entitled to share the appointing judge's absolute immunity . . . . [A] receiver's immunity is derivative of the appointing judge's judicial immunity . . . .") (compiling cases from various circuits). Other courts have recognized that decisions regarding appointment of counsel *in a particular* case are judicial in nature, although they have disagreed over whether decisions to include attorneys on a general appointment register are. *See Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 223-26 (5th Cir. 2009) (compiling cases holding that appointment of counsel in a particular case is a judicial act and holding that selecting attorneys for inclusion on a list for future court appointments is a judicial function covered by absolute immunity); *Mitchell v. Fishbein*, 377 F.3d 157, 172-74 (2d Cir. 2004) (formulating a list of attorneys to represent indigent defendants is administrative, not judicial, in nature).

**[33]** From these examples, we can draw a broad principle. Decisions related to general conditions of employment—including decisions to hire, promote, transfer, and terminate—and which do not affect the prosecutor's role in any particular matter are generally not sufficiently related to the initiation and conduct of a prosecution in a court of law or their role as an advocate of the state to qualify for absolute immunity. Decisions related to appointments and removals in a particular matter will generally fall within the exercise of the judge's or prosecutor's judicial and quasi-judicial roles and are shielded from suit by absolute immunity.

Were this a dispute between Thomas and Wilenchik over his hiring as a line prosecutor for the MCAO, Thomas would not be entitled to absolute immunity. But it is not. Wilenchik was not seeking employment at the MCAO, and this is not a

suit by Wilenchik against Thomas. Rather, it is a suit by Lacey blaming Thomas for having appointed Wilenchik as an Independent Special Deputy Maricopa County Attorney in the *New Times* matter. Wilenchik was appointed for no other purpose than to investigate and, as appropriate, bring charges against the *New Times*, Lacey, and Larkin. As Wilenchik points out in his response brief, "a special prosecutor, by definition, is appointed to prosecute one incident against a particular individual or individuals."

More trenchantly, former Attorney General Robert Jackson described

> the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than cases that need to be prosecuted. . . . In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.

Robert Jackson, Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor, (Apr. 1, 1940), *reprinted in* 24 J. Am. Judicature Soc'y 18 (1940). Special prosecutors, by the nature of their appointment, brook this "most dangerous power." And we are well aware of the controversy that can attend the appointment of a special prosecutor and any consequent investigations and prosecutions; such matters often produce profound political consequences for the party being investigated, the appointing authority, and the special prosecutor. Accordingly, the appointment of a special prosecutor, unlike a decision to hire a new assistant district attorney, is intimately and publicly tied to the imminent investigation of the target. But whatever the danger inherent in the power to pick either the case or the man, the power is one quintessentially belonging to the prosecutor. In that sense a special appointment is fundamentally "unlike claims of, say,

unlawful discrimination in hiring employees." *Van de Kamp*, 555 U.S. at 344. Even if Wilenchik were in some sense hired by Maricopa County, he was appointed by Thomas to do one and only one thing: prosecute the *New Times*.

Perhaps the case most closely analogous is *Yaselli v. Goff*, an early and important decision relied on by the Court in *Imbler*. *See Imbler*, 424 U.S. at 422, 424, 428. In that case, Yaselli alleged that Goff, a Special Assistant to the Attorney General, had falsely and maliciously prosecuted him, culminating in a directed verdict for Yaselli. The court first held that "a special assistant to the Attorney General of the United States, in the performance of the duties imposed upon him by law, is immune from a civil action . . . although it results in a verdict of not guilty rendered by a jury." *Yaselli*, 12 F.2d at 406. The Second Circuit then turned to a "novel question": whether Goff was also entitled to immunity from Yaselli's claim that Goff "had conspired to prosecute plaintiff maliciously, and in a step in furtherance of the plan confederated and agreed that Goff would obtain an appointment as an assistant to the Attorney General for the purposes of the prosecution." *Id.* at 407. The court held that Goff was entitled to absolute immunity for his appointment, even if obtained by conspiracy:

> In our opinion, the reasons which compel us to hold that one who obtains an appointment as a prosecuting officer of the government is immune from civil liability for acts done by him in the discharge of his official duties apply in like manner to protect him against such a charge as that he was governed by improper motives in securing the appointment. The important fact is that he was appointed to the office, and, having been appointed, the public interests require that he shall be free and fearless to act in the discharge of his official duties. If he cannot be charged with acting willfully and maliciously after he gets appointed to the office, no more can he be

charged with having conspired to get into the office in order to act willfully and maliciously after he gets his appointment. The one charge is as much to be feared as the other, and is equally derogatory to his public character and usefulness in the office. We are unable to distinguish between the two cases in principle.

*Id.* The Supreme Court affirmed the Second Circuit in a one-sentence opinion. 275 U.S. at 503.

We think that these principles compel the conclusion that Thomas is entitled to absolute immunity for his appointment of Wilenchik. Several points inform our judgment. First, Thomas, as the County Attorney, had the right to choose who would be the advocate for the state for the *New Times* matter and clothe him or her with the power to pursue prosecution. Whether he designated an attorney from within the MCAO, referred the matter to another county attorney, or appointed outside counsel to represent the state, Thomas acted as an advocate for the state by determining who would be its advocate in court. Once he decided to appoint outside counsel, Thomas conferred the full prosecutorial authority of the MCAO on Wilenchik—authority which could only come from him as County Attorney.[18] The appointment was thus also a prosecutorial function because a prosecutor was uniquely required to perform it, and no other official not entitled to prosecutorial immunity for prosecutorial functions (for

---

[18]The First Complaint provides little detail on the exact process whereby Wilenchik came to be appointed and assumed his authority. It states that Thomas had "ultimate authority and responsibility for the MCAO and the actions of its officers and agents." First Compl. ¶ 9. It later states that "Wilenchik was hired by Thomas and Arpaio." *Id.* ¶ 50. It does not explain that Arpaio had any formal role in the appointment process. It appears from Arizona law that as County Attorney, Thomas alone had the power to appoint Wilenchik as a "special deputy county attorney," and that he could do so only "[w]ith consent of the board of supervisors." Ariz. Rev. Stat. § 11-403(B)(1).

example, a county sheriff) could do so. Thomas's determination that Wilenchik would be a fit advocate for the state "necessarily require[d] legal knowledge and the exercise of related discretion," *Van de Kamp*, 555 U.S. at 344, and is one of "the duties of the prosecutor in his role as advocate for the State [that] involve[s] actions preliminary to the initiation of a prosecution," *Imbler*, 424 U.S. at 431 n.33.

Second, although we have rejected Wilenchik's own claim to absolute immunity, it is clear that Wilenchik, as a special prosecutor, would have been entitled to immunity for any prosecutorial functions he exercised. He would, for example, have been entitled to absolute immunity in connection with the preparation of an arrest warrant, *see Kalina*, 522 U.S. at 129, and for appearances before a grand jury, *see Burns*, 500 U.S. at 490 n.6, in a probable cause hearing, *see id.* at 490, and in trial, *see Imbler*, 424 U.S. at 430-31. It is incongruous to deny Thomas absolute immunity for the act of conferring on Wilenchik the very authority that brings with it a claim to absolute immunity.

**[34]** Furthermore, the policy justifications for absolute immunity attach with full force to the appointment of a special prosecutor by the county attorney. Just as general employment decisions are the type of "litigation-inducing conduct" that is not "connected with the prosecutor's role in judicial proceedings," *Burns*, 500 U.S. at 494, the appointment of a special prosecutor for a particular matter is the type of decision for which absolute prosecutorial immunity is required. Within a large office such as the MCAO, designating who among the county's regular attorneys will take the lead in a particular matter is the necessary first step in the "initiation and conduct of the prosecution." *Burns*, 500 U.S. at 492. If a district attorney were not entitled to absolute immunity, defendants could bring retaliatory lawsuits against him for appointing their prosecutor or special prosecutor. "Such 'harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties,'

and would result in a severe interference with the administration of an important public office." *Rehberg*, 132 S. Ct. at 1504 (quoting *Imbler*, 424 U.S. at 423). If defendants are permitted to bring suit against the district attorney (because they are barred from bringing claims against the special prosecutor himself), the district attorney's best anticipatory defense would be to involve himself in everything, thus causing a further "deflection of the prosecutor's energies." Here, for example, had Thomas made the decision to file charges and then instructed Wilenchik to complete the task, or had he even filed a baseless information and then appointed Wilenchik to try the case, Thomas would receive absolute immunity. Declining to afford him absolute immunity for his supervisory decision to assign the nascent matter will strike at the heart of any supervising prosecutor's ability to delegate matters to other prosecutors. The Supreme Court in *Van de Kamp* expressed concern for just such a scenario, where "a prosecutorial supervisor or colleague might himself be liable for damages *instead of* the trial prosecutor" and concluded that "differences in the pattern of liability among a group of prosecutors in a single office" would disrupt the way prosecutors carry out their functions. 555 U.S. at 345. "[I]t is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance." *Id.* (quoting *Kalina*, 522 U.S. at 125).

The facts of this case make it even clearer that this particular appointment was a prosecutorial function for which immunity is vital. Under Arizona law, a prosecutor has a legal "duty to avoid a conflict of interest . . . because his paramount duty is to the principle of 'fairness.' " *Villalpando v. Reagan*, 121 P.3d 172, 176 (Ariz. Ct. App. 2005). If the County Attorney has a conflict of interest in a case, the entire office may "have to divorce itself from the prosecution in [that] case, because even the appearance of unfairness cannot be permitted." *State v. Latigue*, 502 P.2d 1340, 1342 (Ariz. 1972). At that point, it is "necessary that the County Attorney secure the appointment of a special prosecutor if he wishes to continue

the prosecution of [that] case." *Id.* "Once [the] criminal case had been transferred to a special prosecutor, the Maricopa County Attorney's Office should have ceased all of its participation therein except for such activities as were stipulated to by counsel and approved by the court." *State v. Rupp*, 586 P.2d 1302, 1307-08 (Ariz. Ct. App. 1978).

Here it is uncontested that Thomas had a conflict of interest, First Compl. ¶¶ 42 & n.3, 49, precluding him and his office from prosecuting the case and requiring the appointment of a special prosecutor. Thus, Thomas was acting "within the scope of [his] duties," *Imbler*, 424 U.S. at 423—both legal and ethical—in recusing himself and appointing a special prosecutor. Thomas had to decide whether he had a conflict of interest such that he could no longer represent the state. Once he decided that he could not, he was obligated to select a replacement who would both competently fulfill the obligations of the post and be free of the disabling conflict. While Lacey argues that Thomas made these decisions with malice, the fact remains that these determinations "necessarily require legal knowledge and the exercise of related discretion," *Van de Kamp*, 555 U.S. at 344, even more so than for any run-of-the-mine appointments not motivated by a conflict of interest. It is inconceivable that Thomas could be civilly liable for his decision to recuse himself and appoint a special prosecutor, as he was legally and ethically required to do, but not liable for proceeding himself in the face of such a conflict (though this might have exposed him to professional discipline for ethical violations). The need for recusal and appointment to cure a conflict of interest only further justifies granting Thomas absolute immunity.

**[35]** Lastly, we observe that Thomas's appointment of a special prosecutor—both his decision to appoint one and his decision to appoint Wilenchik—although immune from judicial scrutiny under § 1983, "does not leave the public powerless to deter misconduct or to punish that which occurs." *Imbler*, 424 U.S. at 429. There are still legal, political, and

administrative constraints in place. If Thomas violated any criminal statutes in his appointment of Wilenchik, his actions may be addressed through criminal punishment under the laws of Arizona or the United States. Appointments to office are frequently a political act, and the appointment of a special prosecutor may carry the air of politics (or even the stench of cronyism). Any missteps by Thomas in making the special appointment may be redressed through political processes such as impeachment, recall, and the next general election. If he has violated a canon of ethics, his critics may look to the state bar for appropriate sanctions. Thomas, however, may not be sued under § 1983 and is entitled to absolute immunity for his appointment of Dennis Wilenchik as Independent Special Deputy Maricopa County Attorney.

D. *Conspiracy*

Finally, we deal with Lacey's conspiracy claim.[19] As we explained in *Gilbrook v. City of Westminster*:

> "A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." To prove a civil conspiracy, the plaintiff must show that the conspiring parties "reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." "To be lia-

---

[19]Defendants argue that the conspiracy claim is waived because Lacey did not discuss it in his opening brief, and they filed a motion to strike that portion of Lacey's reply brief. Lacey's assertion of the issue in his opening brief was minimal. *See* Pls.' Opening Br. at 22 n.6 ("For the same reasons set forth herein, infra, the District Court also erred in dismissing the § 1983 conspiracy claims alleged in Count V of the Complaint."). Inasmuch as conspiracy is not an independent claim for relief, but helps to connect the actions of multiple defendants, and given the detail in Lacey's complaint, this was sufficient to preserve the issue in this case. We therefore deny the defendants' motion to strike.

> ble, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.

177 F.3d 839, 856-57 (9th Cir. 1999) (citations omitted). As with Lacey's other claims, his allegations of conspiracy must satisfy *Iqbal*.

Conspiracy is not itself a constitutional tort under § 1983. *See Cassettari v. Nev. Cnty.*, 824 F.2d 735, 739 (9th Cir. 1987) ("The insufficiency of these allegations to support a section 1983 violation precludes a conspiracy claim predicated upon the same allegations."); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) ("[M]ere proof of a conspiracy is insufficient to establish a section 1983 claim.") (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 622 (7th Cir. 1979), *rev' d in part on other grounds*, 446 U.S. 754 (1980)). It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation. Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired. Conspiracy in § 1983 actions is usually alleged by plaintiffs to draw in private parties who would otherwise not be susceptible to a § 1983 action because of the state action doctrine, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010); *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002), or to aid in proving claims against otherwise tenuously connected parties in a complex case, *see Gilbrook*, 177 F.3d at 856-58.

With regard to Wilenchik and Arpaio, it is not clear how Lacey's conspiracy claim benefits him here. The conspiracy

alleged is a conspiracy by Wilenchik and Arpaio to violate the same constitutional rights that we have already concluded were sufficiently pled as individual claims against them. It may be that the conspiracy claim helps to bridge any gap between, for example, Wilenchik and Arpaio and the false arrest claim, a claim that may raise more complicated issues regarding the "causal connection . . . between the retaliatory animus of one person and the action[s] of another." *Hartman*, 547 U.S. at 262.

[36] Whether or not Lacey needs the conspiracy charge to make his case against Wilenchik and Arpaio, the existence of a conspiracy has been adequately alleged; the situation with Thomas is more complex because he is otherwise immune from suit for all of the § 1983 claims against him. Lacey has alleged that Wilenchik's, Arpaio's, and Thomas's wrongful conduct was "undertaken pursuant to an agreement or meeting of the minds among Defendants to act in concert to violate Plaintiffs' constitutional rights, silence Plaintiffs' criticism of them, chill free speech, . . . and interfere with . . . Plaintiffs' business." First Compl. ¶ 147; FAC ¶ 163. The complaint states that Wilenchik, Arpaio, and Thomas formed a conspiracy to violate Lacey's constitutional rights, and it details reasons for why each had a motive to target the *New Times*. First Compl. ¶¶ 96-98; FAC ¶¶ 114-16. The Lebowitz Memorandum acknowledges that Arpaio had targeted the *New Times*, but not the other websites publicizing Arpaio's home address, because the paper had been "historically anti-Arpaio," had the "purpose [of] destroy[ing] the Sheriff's career," and had published "articles against the Sheriff, using language that is inflammatory, insulting, vituperative, and the like." FAC, Ex. 1, at 8. But the longstanding feud between the *New Times* and Arpaio was just the beginning. The *New Times* had also criticized Arpaio, Thomas, and Wilenchik, individually and collectively, for corrupt activity; one sentence of a *New Times* article republished in the complaint ties all three together in a scheme of kickbacks.[20] The coverage was critical enough to

---

[20]The article stated that Thomas had "not only steered a lot of business to his old firm, he has hired his old boss (Wilenchik) to harass Sheriff Joe Arpaio's chief political rival." FAC ¶ 70 n.5.

make Thomas believe that he had a personal conflict of interest in his prosecuting the *New Times*. He recused himself and appointed Wilenchik. But Wilenchik had his own issues with the *New Times*. Indeed, in an email authored less than a week before his appointment, he railed against the *New Times* for coverage critical of his relationship with Thomas. FAC ¶¶ 76-77.

**[37]** Accepting the complaint as true, we find that it shows that appointing Wilenchik was part of a plan to harass and prosecute the *New Times*, largely for the benefit of Arpaio. Wilenchik was "Thomas' friend, former employer, financial benefactor, [and] campaign finance manager." *Id.* ¶ 66. Thomas stated after the arrests that Wilenchik had been chosen because "he had the confidence of the Sheriff," *id.* ¶ 74 n.8, which is not surprising given that Wilenchik, immediately prior to his being appointed special prosecutor, had represented Arpaio and Thomas in their personal capacities and had threatened to sue newspapers, including the *New Times*, for allegedly defamatory stories critical of them. It requires no leap to infer that if Arpaio was determined to pursue a baseless prosecution of the *New Times*, Wilenchik was motivated to join him because of his close prior relationship with Thomas, his prior representation of Arpaio, and his personal animus toward the *New Times*. Furthermore, this conspiracy between Arpaio and Wilenchik plausibly both preceded and continued after Wilenchik's appointment.

With regard to Thomas, however, the picture of the conspiracy is not so clear. The above allegations at most raise a plausible claim that Thomas was part of a conspiracy to appoint Wilenchik as special prosecutor to prosecute Lacey and harass the *New Times*. We have already held that absolute immunity shields him from any liability for appointing Wilenchik. Our first question, then, is whether Thomas forfeits his absolute immunity if he conspired in the appointment with Wilenchik and Arpaio, who are not immune from suit. We largely answered this question in *Ashelman v. Pope*, 793

F.2d 1072, 1074-75 (9th Cir. 1986) (en banc). In *Beard v. Udall*, 648 F.2d 1264 (9th Cir. 1981), we had held that "where a prosecutor faces an actual conflict of interest, and files charges he or she knows to be baseless, the prosecutor is acting outside the scope of his or her authority and thus lacks immunity." *Id.* at 1271. On the basis of *Beard*, the *Ashelman* panel held that the judge and prosecutor were not entitled to absolute immunity if they had conspired to deprive a criminal defendant of his constitutional rights. *Ashelman v. Pope*, 769 F.2d 1360, 1362 (9th Cir. 1985). Sitting en banc, we overruled *Beard* and held that "[a]llegations of conspiracy between judge and prosecutor to predetermine the outcome of a judicial proceeding are insufficient to overcome those immunities." *Ashelman*, 793 F.2d at 1079. We concluded that "our prior decisions construed the immunity doctrines too narrowly by focusing on underlying actions instead of looking to the ultimate acts." *Id.* at 1078. We held that "[i]ntent should play no role in the immunity analysis. Moreover, allegations that a conspiracy produced a certain decision should no more pierce the actor's immunity than allegations of bad faith, personal interest or outright malevolence." *Id.* (citation omitted). Thus, irrespective of any claim of conspiracy, "[p]rosecutors are absolutely immune for quasi-judicial activities taken within the scope of their authority." *Id.* The Supreme Court has recently adopted a similar principle in the context of a grand jury witness who was alleged to have conspired against the accused:

> [T]his rule [that a grand jury witness has absolute immunity from § 1983 liability] may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves."

*Rehberg*, 132 S. Ct. at 1506 (quoting *Buckley*, 509 U.S. at 283 (Kennedy, J., concurring in part and dissenting in part)); *see also Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1282 (11th Cir. 2002); *Mastorianni v. Bowers*, 173 F.3d 1363, 1367 (11th Cir. 1999); *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994); *Holloway v. Walker*, 765 F.2d 517, 522 (5th Cir. 1985). Thus, Thomas does not lose his absolute immunity even if he is alleged to have conspired with Wilenchik and Arpaio to appoint Wilenchik as special prosecutor so that Wilenchik could prosecute the *New Times*. *See Yaselli*, 12 F.2d at 407.

We think there may be a caveat, however, if Thomas actively conspired with Wilenchik and Arpaio in some way unrelated to Wilenchik's appointment. That is, Thomas may forfeit his absolute immunity if, following his appointment of Wilenchik and despite his public recusal, he continued to conspire with Wilenchik and Arpaio in their conduct that was not prosecutorial in nature and for which (we have held) they cannot claim immunity. We do not have to reach the question here because we find that Lacey has not sufficiently pled facts supporting any such agreement.

The conclusory conspiracy allegations in the original complaint do not define the scope of any conspiracy involving Thomas, what role he had, or when or how the conspiracy operated. They are insufficient to implicate Thomas, for whom the form and timing of his allegedly conspiratorial conduct matters. None demonstrate that Thomas continued to participate after Wilenchik's appointment, only that the consequences of any pre-appointment conspiracy continued to play out as intended; similarly, the allegations that Wilenchik carried out Thomas's intention to harass the *New Times* are vague and do not demonstrate that any communication occurred at all between the two, or between Thomas and Arpaio, following Thomas's appointment of Wilenchik.[21] *See*

---

[21]The closest Lacey comes to a post-appointment allegation against Thomas is in paragraph twenty-five of the First Amended Complaint, a

First Compl. ¶ 18 ("Defendants flexed their political muscle in the form of a conspiracy. They abused their governmental authority by attacking the press, punishing free speech, demeaning the role and function of an impartial prosecutor and an independent judiciary, perverting the grand jury process, and serving [subpoenas on] citizens . . . ."); *id.* ¶ 62 ("Wilenchik took on his new role as a criminal prosecutor with all the zeal and ruthlessness that Arpaio and Thomas required, expected, and had paid for. Armed with daunting prosecutorial power and the approval and support of Arpaio and Thomas, Wilenchik engaged in a series of inappropriate, unethical, and unlawful acts . . . ."); *id.* ¶ 97 ("Wilenchik . . . eagerly did the bidding of Thomas and the Sheriff, in their attempt to punish and financially ruin a newspaper that was too often critical of him."); *id.* ¶ 94 ("The investigation, pursuit, and arrests of *The New Times* was unjustified and unwarranted. It was the product of a conspiracy among Defendants."); *id.* ¶ 147 ("The wrongful conduct of Defendants as alleged herein were undertaken pursuant to an agreement or meeting of the minds among Defendants to act in concert to violate Plaintiffs' constitutional rights, silence Plaintiffs' criticism of them, chill free speech, . . . and interfere with . . . Plaintiffs' business." ); *id.* ¶ 148 ("Defendants' acts and/or omissions as alleged herein to pursue and conduct a criminal investigation and prosecution of *The New Times*, including (without limitation) the arrests and jailings, were

---

complaint that did not allege conspiracy against Thomas and to which Thomas has had no opportunity to respond. Referring to the arrests of Lacey and Larkin, the complaint states: "Arpaio's top-aide Chief Hendershott, claims to have personally ordered the arrests. Other witnesses, including lawyers from Wilenchik's office, claim that the arrests were made after consultation with Wilenchik and lawyers from his office. Still, other evidence suggests that the arrests came at the request of the prosecutor or Thomas himself." FAC ¶ 25. There is no antecedent for the mysterious "other evidence" and nothing else to link Thomas to any postappointment conspiracy. This is simply inadequate to prop up the claim that Thomas took steps to conspire with Wilenchik and Arpaio *after* he recused himself by appointing Wilenchik.

undertaken pursuant to a conspiracy among Defendants to violate Plaintiffs' constitutional rights.").

Moreover, the picture of Thomas that emerges from the complaint suggests that he was concerned about the need to recuse himself from any decisionmaking regarding the *New Times*. There is no allegation that, during the early stages of the investigation, he influenced the line investigators and prosecutors at the MCAO charged with investigating the case or that he pressured the PCAO. *See id.* ¶¶ 37, 39. Nor is there any evidence that he talked with Wilenchik after his appointment. Instead, the complaint details that it was Arpaio who threatened the MCAO and the PCAO, and Arpaio who consulted with Wilenchik regarding the arrests. *See id.* ¶¶ 40, 44-45, 47, 97. Indeed, the complaint's principal claim against Thomas after he appointed Wilenchik is that he *failed* to supervise him. *See id.* ¶ 98 (Thomas "failed to properly supervise Wilenchik, failed to ensure he was properly trained and capable of handling a criminal investigation, and failed to provide him with training and supervision necessary to ensure that the criminal investigation was conducted constitutionally"); *see also* FAC ¶ 115 ("[Wilenchik] filed odious papers in Court and issued unlawful subpoenas during the investigatory stage of the case, when no charges had been filed, no indictments issued, and *without any involvement by a grand jury or approval from a court and/or Thomas.*") (emphasis added).[22] From the complaint, it appears that Thomas washed his hands of the whole matter after appointing Wilenchik until the day he fired Wilenchik for "the wrong way" he brought the prosecution. First Compl. ¶ 109. The allegations are insufficient to implicate Thomas in any conspiracy other than Wilenchik's appointment. He is, therefore, also immune from any liability through conspiracy. *See Ashelman*, 793 F.2d at 1078-79; *see Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1148 (2d Cir. 1995) ("[W]hen the underlying activity at issue is

---

[22]Even if the supervisory liability claim had been pressed on appeal, it would be wholly foreclosed by *Van de Kamp*, 555 U.S. at 345.

covered by absolute immunity, the 'plaintiff derives no benefit from alleging a conspiracy.' " (citation omitted)).

**[38]** Nevertheless, because the district court found that the defendants had not violated Lacey's constitutional rights, it never reached the issue of whether Lacey sufficiently alleged that Thomas was part of a conspiracy to deprive Lacey of those rights. Because we reach the issue first on appeal, we believe that Lacey should be granted an opportunity amend his complaint. Leave to amend "shall be freely given where 'justice so requires,' " *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1010 (9th Cir. 2008) (quoting Fed. R. Civ. P. 15), and it should be granted "unless . . . the pleading could not possibly be cured by the allegation of other facts," *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). Lacey may have relied on the appointment of Wilenchik to show Thomas's participation in the conspiracy, which would have been reasonable at the time. He may have other facts to allege—though they must not be inconsistent with those already alleged, *see Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990), and must be sufficiently specific to satisfy *Iqbal*—that will demonstrate Thomas's participation in some other conspiracy. While the dismissal was proper, given our holdings above, a dismissal with prejudice was not. We reverse the dismissal with prejudice and remand the conspiracy claim against Thomas with instructions that Lacey be granted leave to amend.

\*\*\*\*\*

In sum, Lacey may proceed with his causes of action under the First, Fourth, and Fourteenth Amendments against Arpaio and Wilenchik. Lacey may not proceed with his claim of malicious prosecution. Thomas is entitled to absolute immunity, but Lacey may amend his complaint with regard to the conspiracy claim against Thomas.

## IV.   FEDERAL RACKETEERING CLAIMS

**[39]**  The district court dismissed Lacey's federal racketeering claims because he failed to allege any of the predicate acts necessary for liability. *See* 18 U.S.C. § § 1961-1968. "[R]acketeering activity" is defined as acts or threats involving a variety of crimes, such as "murder, kidnapping, gambling, arson, robbery, bribery, [or] extortion." 18 U.S.C. § 1961(1). We agree with the district court that Lacey offers only vague allegations with no factual support that the defendants engaged in any of the requisite predicate crimes. This "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). We therefore affirm the district court's order on this claim.

## V.   STATE LAW CLAIMS

In its October 2008 order, the district court dismissed some of Lacey's state-law claims for failure to state a claim, but allowed Lacey to amend his complaint. Lacey did so, and in its March 2009 order, the district court did not revisit the state law claims, explaining that once it dismissed all of the federal claims, it no longer had supplemental jurisdiction over the remaining state law claims. The district court then remanded the state claims to the Maricopa County Superior Court.

**[40]**  The Supreme Court recently held that dismissal of federal claims does not automatically deprive district courts of subject matter jurisdiction over any supplemental claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). Rather, the district court retains discretion over whether to exercise supplemental jurisdiction over state law claims even after all federal claims are dismissed. *Id.*; *see also* 28 U.S.C. § 1367(c)(3) ("The district courts *may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.") (emphasis added). Where a district court

"dismiss[es] every claim over which it had original jurisdiction," it retains "pure[ ] discretion[ ]" in deciding whether to exercise supplemental jurisdiction over the remaining claims. *Carlsbad Tech.*, 556 U.S. at 639. Thus, the district court should have exercised its discretion and decided whether it would have been appropriate to keep the state claims in federal court. In any event, because we reverse the district court's dismissal of some of Lacey's federal claims, on remand the district court should reconsider whether to exercise supplemental jurisdiction over the state law claims.

## VI.  MARICOPA COUNTY

**[41]** In his amended complaint, Lacey alleged that Maricopa County should be liable under § 1983 because Arpaio and Thomas were policymakers whose decisions and acts represented Maricopa County policy; he claims that the constitutional violations he suffered were the result of their and Maricopa County's unconstitutional policies, practices, and training. Because the district court had previously concluded that Lacey had suffered no constitutional harm, it dismissed all of Lacey's claims against Maricopa County. Because we conclude that Lacey sufficiently alleged constitutional violations, we reverse the district court's decision and direct it on remand to reconsider the claims against Maricopa County in the first instance. We express no view on the merits of these claims.

## VII.  CONCLUSION

For the foregoing reasons, we affirm the district court's decision to grant qualified immunity to Wilenchik and Arpaio on Lacey's malicious prosecution claims. We reverse the district court's grant of qualified immunity to Wilenchik and Arpaio as to Lacey's Fourteenth Amendment claims based on the First Amendment (retaliation), Fourth Amendment (false arrest), and Equal Protection Clause (selective prosecution). We reverse the dismissal with prejudice of the conspiracy

claim against Thomas and remand with instructions to grant leave to amend on that claim. We affirm the district court's dismissal of the federal racketeering claims. We remand to the district court with instructions to reconsider the claims against Maricopa County and whether to exercise supplemental jurisdiction over the state law claims. Finally, we deny the defendants' motion to strike the portion of Lacey's reply brief that addresses Lacey's § 1983 conspiracy claim.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. All parties to bear their own costs.

---

Chief Judge KOZINSKI, dissenting in part:

**1.** Adjectives matter. They're not as action-packed as verbs, nor as self-sufficient as nouns. But adjectives do make a difference. Here, the majority overlooks a crucial one: "special."

Dennis Wilenchik wasn't just any prosecutor: He was a special prosecutor. He got the job because his crony, County Attorney Andrew Thomas, gave it to him. Plaintiffs allege Wilenchik used that power to harass Thomas's and Sheriff Joe Arpaio's enemies. For this, the majority anoints Thomas with every governmental wrongdoer's favorite unguent, absolute immunity.

The Supreme Court has told us that "absolute prosecutorial immunity [is justified] only for actions that are connected with the prosecutor's role in judicial proceedings." *Burns* v. *Reed*, 500 U.S. 478, 494 (1991). By appointing Wilenchik as special prosecutor, Thomas took no action remotely connected with any judicial proceeding. Instead, he gave up the power to take any such action and transferred it to his special buddy, Wilenchik.

*Van de Kamp* v. *Goldstein*, 555 U.S. 335 (2009), holds that prosecutors have absolute immunity for "the types of activities . . . [that] necessarily require legal knowledge and the exercise of related discretion." *Id.* at 344. When Thomas appointed Wilenchik as his cat's paw, he was exercising discretion alright, but not discretion that required legal knowledge. The whole point of handing a case over to a special prosecutor is to give up discretion over any and all prosecutorial decisions. Appointing a special prosecutor is an act of abandoning prosecutorial discretion, not exercising it.

Here, Thomas recognized (correctly) that he could not decide whether to prosecute plaintiffs because of his obvious conflict of interest as a target of their criticism. So, when Thomas appointed a special prosecutor, he (1) relinquished discretion and thus (2) cut himself off from any "role in judicial proceedings," *Burns*, 500 U.S. at 494, or any "direct[ ] connect[ion] with the conduct of a trial," *Van de Kamp*, 555 U.S. at 344. That's the opposite of the activity for which *Van de Kamp* provided absolute immunity. It's also the opposite of "the decision to prosecute," which the Supreme Court found protected by absolute immunity in *Hartman* v. *Moore*, 547 U.S. 250, 261-62 (2006). And it's the opposite of "initiating a prosecution," which the Court found protected by absolute immunity in *Imbler* v. *Pachtman*, 424 U.S. 409, 431 (1976).

The Court extended absolute immunity to a prosecutor's "*general* methods of supervision and training" of those working in his office, because such activities "require legal knowledge and the exercise of related discretion." *Van de Kamp*, 555 U.S. at 346, 344. *Van de Kamp* explicitly distinguished between the activity at issue there—"a kind that itself is directly connected with the conduct of a trial"—and "administrative duties concerning, for example, workplace hiring." *Id.* at 344. It is thus perfectly clear that hiring and firing of prosecutors is an administrative action that is not protected by absolute immunity. *See also Forrester* v. *White*, 484 U.S. 219,

229 (1988) ("[A] judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions. Such decisions . . . are often crucial to the efficient operation of public institutions . . . , yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983.").

If hiring and firing line prosecutors is not protected by absolute immunity, appointing a special prosecutor certainly is not. Subordinate prosecutors, after all, require general supervision and training, which remain the chief prosecutor's responsibility. Not so a special prosecutor. Once appointed, he serves as an independent agent and makes all prosecutorial decisions without any input or oversight of the chief prosecutor. There is absolutely no justification for giving Thomas absolute immunity for the non-prosecutorial and self-serving act of appointing Wilenchik to do his dirty work.

The majority finds "most closely analogous" to our case an eighty-six-year-old decision of the Second Circuit that was summarily affirmed by the Supreme Court. Maj. op. at 10060 (citing *Yaselli* v. *Goff*, 12 F.2d 396 (2d Cir. 1926), *aff'd*, 275 U.S. 503, 503 (1927) (per curiam)). *Yaselli* presented the exact converse of the question before us: It asked whether a special prosecutor was entitled to absolute immunity for conspiring to get appointed to that post. The Second Circuit, quite understandably, found the act of getting appointed as special prosecutor a mere prelude to serving as special prosecutor and therefore entitled to the same immunity. Seeking appointment, like acting on one's appointment, is precisely the type of discretionary act by a prosecutor that receives absolute immunity. But, as I've explained, the act of *appointing* is an administrative act whose entire purpose is to give away discretion, not to exercise it. *Yaselli* is too fragile a precedent to support the weight the majority places on it.

By enveloping Thomas with absolute immunity, my colleagues encourage malicious or corrupt prosecutors to do exactly what plaintiffs allege Thomas did here: intimidate and harass political rivals by delegating prosecutorial authority to a straw man. It's a blueprint for prosecutorial excess and abuse; we'll rue the day we started down this road.

**2.** Nor can I assent to the majority's dismissal of plaintiffs' selective enforcement claim based on their middle-of-the-night arrests for allegedly violating Arizona's grand jury secrecy statute. The majority faults plaintiffs for making "only a vague assertion that those who commit nonviolent misdemeanors are usually not arrested" and for "fail[ing] to specify a similar class, such as those alleged to have violated the grand jury secrecy statute, with which comparisons can be made to Lacey's case." Maj. op. at 10040 n.13. But here's what plaintiffs say in their complaint: "Misdemeanor violations that do not threaten lives are usually handled by the issuance of citations, not by commando raids, arrests, handcuffs, and jail cells in the dead of night."

This patently plausible allegation suffices to make out a selective enforcement claim. Plaintiffs meet "[t]he similarly situated requirement," *United States* v. *Armstrong*, 517 U.S. 456, 466 (1996): They identify the class of those accused of non-violent misdemeanors, and allege they were treated differently from other members of that class. They thus "identify a similarly situated class against which the plaintiff[s'] class can be compared." *Rosenbaum* v. *City & Cnty. of S.F.*, 484 F.3d 1142, 1153 (9th Cir. 2007) (internal quotation marks omitted). Why the majority demands a narrower class, like those charged with violating the exact same statute, is a mystery to me; the majority offers no explanation. And it makes no sense: Being treated differently from a *large* class provides a more compelling case for selective enforcement than being treated worse than a *small* class. The majority has it entirely backward.

* * *

I therefore must dissent from Subsection III.C.2, maj. op. at 10054-65, and footnote 13 in Subsection III.A.2.d, maj. op. at 10040 n.13, of Judge Bybee's otherwise splendid decision.

---

TALLMAN, Circuit Judge, with whom Circuit Judges BEA and IKUTA join, dissenting in part:

I join the majority opinion, but dissent as to parts III.A.2.d and III.B.4 because Dennis Wilenchik and Sheriff Joseph Arpaio are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment Equal Protection claims.

In order for Plaintiffs to make out a claim that Wilenchik and Arpaio selectively enforced the Arizona privacy statute against *The New Times* in violation of Plaintiffs' rights to equal protection, Plaintiffs must at a minimum allege that "similarly situated" parties "could have been prosecuted, but were not." *United States v. Armstrong*, 517 U.S. 456, 469 (1996). In other words, they must allege that publishers of Arpaio's personal information other than *The New Times* were similarly culpable under all three prongs of the Arizona privacy statute: (1) knowingly making available a public official's personal information on the internet, where (2) dissemination of the information posed an "imminent and serious threat" to the safety of the public official or his immediate family, and where (3) the threat was "reasonably apparent" to the person making the information available. *See* Ariz. Rev. Stats. § 13-2401(A).[1]

---

[1]Ariz. Rev. Stats. § 13-2401(A) states:

   It is unlawful for a person to knowingly make available on the world wide web the personal information of a peace officer, justice, judge, commissioner, public defender or prosecutor if the dissemination of the personal information poses an imminent and

Further, even if Plaintiffs successfully alleged a violation of their right to equal protection, Wilenchik and Arpaio are entitled to qualified immunity unless the right was "clearly established," meaning that, at the time of the challenged conduct, "every 'reasonable official would have understood' " that prosecuting *The New Times* and not prosecuting other publishers violated that right. *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In determining whether enforcement of the Arizona privacy statute only against *The New Times* violated Plaintiffs' clearly established rights, this court must keep in mind that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 2085.

I agree with the original panel, *see Lacey v. Maricopa Cnty.*, 649 F.3d 1118, 1134-35 (9th Cir. 2011), that, although Plaintiffs successfully pled that, like *The New Times*, other publishers made Arpaio's personal information publicly available on the internet, thereby satisfying the first element of Arizona's privacy statute, *see* Ariz. Rev. Stats. § 13-2401(A), they failed to allege that the dissemination by any other publisher posed a similar threat to Arpaio and his immediate family, *see id*. In the absence of any judicial construction of the Arizona privacy statute, a reasonable government official could believe that *The New Times* was more likely to have "pose[d] an imminent and serious threat" to Arpaio's safety than the other publishers because *The New Times* drew attention to Arpaio's home address in conjunction with strongly worded criticism, while the other websites merely included his address among hundreds of entries in an organizational list.

---

serious threat to the peace officer's, justice's, judge's, commissioner's, public defender's or prosecutor's safety or the safety of that person's immediate family and the threat is reasonably apparent to the person making the information available on the world wide web to be serious and imminent.

Further, with respect to the third prong of the statute, Plaintiffs do not deny they were aware of the death threats Arpaio had received when they published his address, instead insisting the threats posed no imminent threat to the Sheriff. Nowhere do Plaintiffs allege that the Maricopa County Recorder's website, the Maricopa County Election Commissioner's website, or the Republican Party's website had similar knowledge of potential threats to Arpaio's personal safety at the time they published his home address. Accordingly, Plaintiffs do not allege that these publishers were similarly culpable under the third prong of the Arizona privacy statute, which requires that the threat be "reasonably apparent" to the person making the information available.

The majority concludes that Plaintiffs need not allege that the other publishers were similarly culpable under the second and third prongs of the statute because, according to Plaintiffs' allegations, *The New Times* publishers themselves were not guilty under these prongs. In essence, the majority holds that all the publishers were "similarly situated" because none of them violated the law. But the majority distorts the *Armstrong* test and our qualified immunity jurisprudence. As the Supreme Court recently reaffirmed, the reasonableness of a government official's conduct must be judged from the official's perspective at the time of the allegedly unconstitutional conduct, not "with the 20/20 vision of hindsight." *Ryburn v. Huff*, 132 S. Ct. 987, 992 (2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation marks omitted).

Prosecutors cannot know in advance of trial whether a suspect is guilty; rather, they must make the decision whether to investigate or bring charges based on the strength of the evidence known to them. They may turn out to be wrong in any given case, but so long as they are applying a neutral set of criteria such as "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan," their decisions are generally immune

from review. *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)) (internal quotation marks omitted). A plaintiff cannot prevail on a selective prosecution claim unless he or she can demonstrate that there were other individuals who were "similarly situated" in terms of these neutral factors who were not prosecuted. Only then is there an inference that the decision to prosecute was based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)) (internal quotation marks omitted). It is irrelevant whether the plaintiff was ultimately acquitted or, as here, charges were never brought.

In light of the limited allegations in the complaint, and the lack of any authoritative judicial construction of the Arizona privacy statute, Wilenchik and Arpaio could reasonably conclude that there was a stronger case that *The New Times*'s publishers knowingly posed a threat to Arpaio's personal safety, and therefore that it was reasonable to investigate only *The New Times*, rather than the other publishers. Regardless whether *The New Times* publishers turned out to be innocent or guilty, they were not similarly situated to the other publishers based on the facts known to the defendants, and Plaintiffs' allegations cannot make it so. Under these circumstances, the defendants are entitled to qualified immunity.

The district court afforded Plaintiffs the opportunity to amend the complaint. Yet, Plaintiffs responded with few additional allegations and continued to opt for a writing style that reads like a newspaper article drafted by an investigative journalist, who leapt to conclusions without verifying the facts. Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court has explicitly demanded more from pleadings. We must be careful not to tread on important jurisprudence simply because the facts Plaintiffs do allege, but have yet to prove, are viewed as sympathetic.